**UNITED STATES of America,**

v.

**Miriam SANTOS.**

No. 99 CR 47.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 8, 1999.

.Chris C. Gair, Freeman, Freeman & Salzman, P.C., Chicago, IL, David J. Stetler, Corey B. Rubenstein, Stetler & Duffy, Ltd., Chicago, IL, for Miriam Santos, defendant.

Jerome Natahan Krulewitch, U.S. Atty's Office, Chicago, IL, for U.S.

## OPINION & ORDER

NORGLE, District Judge.

Before the court is Defendant Miriam Santos' Motion for Release Pending Appeal. For the following reasons, the court denies Defendant's motion.

1. The maximum penalty under 18 U.S.C. § 1951 is 20 years imprisonment and/or a fine of $250,000.

2. The maximum penalty under 18 U.S.C. § 1341 is 5 years imprisonment and/or a fine of $250,000.

## I. INTRODUCTION

Defendant is the former Treasurer of the City of Chicago, which is a position that is responsible for the oversight of approximately $2.5 billion in city funds. Defendant was appointed Treasurer in 1989, and she later ran successfully as the Democratic candidate for Treasurer in elections in 1991, 1995, and (February) 1999. While serving as Treasurer in September 1997, Defendant announced that she would seek the Democratic nomination for Illinois Attorney General. Defendant eventually secured the nomination, but lost in the general election in November 1998.

On January 27, 1999, the Government filed a 12–count indictment that charged Defendant with five counts of attempted extortion in violation of 18 U.S.C. §§ 1951 & 1952,[1] five counts of mail fraud in violation of 18 U.S.C. § 1341,[2] and two counts of wire fraud in violation of 18 U.S.C. § 1343.[3] In short, the Government alleged that Defendant attempted to extort contributions from several brokerage firms for the Democratic Party of Illinois and that she engaged in a scheme to defraud the City of Chicago ("the City") for her political advancement. All of the underlying illegal conduct was alleged to have occurred between October 1997 and October 1998, and was allegedly done to further Defendant's candidacy for Attorney General of Illinois in the then-upcoming November 1998 general election.

At Defendant's arraignment on February 3, 1999, the court set a trial date of April 14, 1999. On February 12, 1999, the court denied Defendant's motion for a continuance. On February 23, 1999, Defendant was re-elected Treasurer.

As scheduled, jury selection began on April 14, 1999, and opening statements

3. The maximum penalty under 18 U.S.C. § 1343 is 5 years imprisonment and/or a fine of $250,000.

began two days later, on April 16, 1999. After two and a half weeks of trial, the jury deliberated approximately six hours before rendering its verdict on May 3, 1999. The jury found Defendant guilty on one count of attempted extortion and the five counts of mail fraud, but.acquitted her on the remaining four counts of attempted extortion and the two counts of wire fraud. Upon her conviction, Defendant automatically lost her position as Treasurer.

On July 27, 1999, the court. sentenced Defendant to a prison term of 40 months. The court granted Defendant's motion to surrender in eight weeks, on October 1, 1999.

Defendant now moves for release pending appeal pursuant to, 18 U.S.C. § 3143(b). She argues that·the court committed several errors that will ultimately require the court of appeals to reverse her conviction on all counts or to order a new trial. Specifically, Defendant contends that: (1) several of the court's evidentiary rulings deprived her of a fair trial; (2) the Government's misconduct during its rebuttal argument resulted in an unfair trial; (3) the court's refusal to continue the trial date violated her Sixth Amendment right to counsel of choice; (4) the court improperly excluded three critical defenses; (5) the court erroneously permitted specific evidence involving an episode with Citibank, N.A., that, coupled with the Govern-

ment's improper reference to that evidence during closing argument, resulted in an unfair trial.

## II. LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3143(b), governs the issue of release pending appeal by the defendant. Enacted largely to reverse the presumption in favor of bail under the Bail Reform Act of 1966, *see United States v. Bilanzich,* 771 F.2d 292, 298 (7th Cir.1985), the statute provides

> that a court may allow a convicted defendant to remain free on bond pending appeal if: (1) the defendant is not likely to flee or pose a danger to the community, (2) the appeal is not ·for the purpose of delay, and (3) the appeal raises a "substantial question of law or fact" likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a sentence that reduces the term of imprisonment.

*United States v. Ashman,* 964 F.2d 596, 598 (7th Cir.1992) *(citing* 18 U.S.C. § 3143(b)); *see also United States v. Greenberg,* 772 F.2d 340, 341 (7th Cir. 1985).[4] "The change Congress enacted 'requires an affirmative finding that the chance for reversal is substantial. This gives recognition to the basic principle that

---

4. Verbatim, § 3143(b) states:
(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or petition for a writ of certiorari, be detained, unless the judicial officer finds—
(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
(i) reversal,
(ii) an order for a new trial,
(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of time already served plus the expected duration of the appeal process.
If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.
(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

a conviction is presumed to be correct.'" *Bilanzich*, 771 F.2d at 298 (*quoting* S.Rep. No. 225, 98th Cong., 1st Sess. 27, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3210). Further, § 3143(b) suggests "that harm results not only when someone is imprisoned erroneously, but also when execution of sentence is delayed because of arguments that in the end prove to be without merit." *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir.1986).

Here, the first two inquiries to determine whether Defendant is entitled to release pending appeal—likelihood of flight and danger to the community, § 3143(b)(1)(A)—are not at issue. Nor is there any indication that Defendant's motion is for the purpose of delay. *See* § 3143(b)(1)(B). The sole contention is whether Defendant raises a substantial question of law or fact likely to result in reversal or an order for a new trial. *See* § 3143(b)(1)(B).

■ Section 3143(b)(1)(B) places "the burden of showing the merit of the appeal" on the defendant. *Bilanzich*, 771 F.2d at 298. Under § 3143(b)(1)(B)'s framework, a defendant who is not a danger or flight risk and does not intend delay must satisfy two elements. *See Shoffner*, 791 F.2d at 588; *Bilanzich*, 771 F.2d at 298. First, she must show that her appeal presents a "substantial" issue. *See Shoffner*, 791 F.2d at 588; *Bilanzich*, 771 F.2d at 298. "An issue is 'substantial' ... if it presents 'a "close" question or one that very well could be decided the other way.'" *United States v. Hattermann*, 853 F.2d 555, 557 n. 6 (7th Cir.1988) (*quoting Shoffner*, 791 F.2d at 589 (7th Cir.1986) (*quoting in turn United States v. Giancola*, 754 F.2d 898, 901 (11th Cir.1985))); *see also United States v. Eaken*, 995 F.2d 740, 741 (7th Cir.1993). While "[t]his standard does not require the district court to predict the outcome of the appeal[,]" *Hattermann*, 853 F.2d at 557 n. 6, the court must find "that the appeal could readily go either way, that it is a toss-up or nearly so." *Greenberg*, 772 F.2d at 341.

■ Once the defendant satisfies this first element, she must address whether the substantial issue will affect the validity of her conviction. *See Shoffner*, 791 F.2d at 588; *Bilanzich*, 771 F.2d at 298. At this stage, the court "must determine whether a contrary appellate ruling is likely to require a reversal of the conviction or a new trial." *Shoffner*, 791 F.2d at 588 (*citing Bilanzich*, 771 F.2d at 298; *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). Thus, the defendant must do more than show that an error occurred at trial; she must persuade the district court that "the appellate court is more likely than not to reverse the conviction or order a new trial on *all* counts for which imprisonment has been imposed." *Bilanzich*, 771 F.2d at 298 (emphasis added); *see also Morison v. United States*, 486 U.S. 1306, 1306–07, 108 S.Ct. 1837, 100 L.Ed.2d 594 (1988) (denying bond application for appeal to Supreme Court where the petitioner had "not shown that his appeal [was] likely to result in reversal with respect to all the counts for which imprisonment was imposed. ...").

With these principles in mind, the court must "return its attention to its own analysis of these issues at earlier stages of the proceedings[,]" *Shoffner*, 791 F.2d at 589, and provide a statement of reasons supporting its disposition of Defendant's motion. *See United States v. Swanquist*, 125 F.3d 573, 575–76 (7th Cir.1997). In *Swanquist*, the Seventh Circuit explained:

Rule 9(a) [of the Federal Rules of Appellate Procedure] unambiguously requires that the district court "must" provide a statement of "reasons" for a decision regarding release, either in writing or orally on the record. Although the standards for what suffices as a statement of reasons are not subject to rigid definition, we believe that a statement of reasons encompasses more than a mere recitation of the statutory language followed by nothing more than a conclusory statement that the applicable factors have (or have not) been met.

*See United States v. Fields,* 466 F.2d 119, 121 (2d Cir.1972) (reasons must "be stated with particularity"); *United States v. Thompson,* 452 F.2d 1333, 1336 n. 7 (D.C.Cir.1971) ("A mere parrotting of the provisions of the applicable statute is not an adequate substitute for a full statement of reasons"), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972). In other words, "a district court's reasons for its decision must be adequately explained; conclusory statements are insufficient." *[United States v. Wheeler,* 795 F.2d 839, 841 (9th Cir. 1986) ] (citations omitted).

The district court's failure to provide the mandatory statement of reasons has several negative consequences. First, in the absence of a remand, it forces us to undertake a task specifically designated to be completed by the district court. Although we conduct a *de novo* review of orders granting or denying release pending appeal (*United States v. Eaken,* 995 F.2d 740, 741 (7th Cir.1993)), it is nevertheless vital to the court of appeals to be apprised of the district court's rationale. *See United States v. Stanley,* 469 F.2d 576, 581–84 (D.C.Cir.1972). Where we are not provided with an adequate statement of reasons, we are forced to speculate as to the reasons for the district court's decision. This is unfair to the bail applicant because it hampers his efforts to obtain bail in the court of appeals and because it injects unnecessary delay in the proceedings of the bail motion. *See United States v. Affleck,* 765 F.2d 944, 954 (10th Cir.1985) (the writing requirement aids the appellate function); *Stanley,* 469 F.2d at 583–84 (" '[t]he District Judge's reasoning must be delineated both out of fairness to the appellant and as an aid to this court' ") (citation omitted). Finally, it stifles the goal of judicial economy by forcing the case to bounce back and forth between the two courts. Judicial economy is particularly important in motions for release, as these motions must be handled expeditiously due to the lib-

erty interest at stake. *See* Fed. R.App.P. 9(a) and (b).

125 F.3d at 575–76; *see also United States v. Hooks,* 811 F.2d 391 (7th Cir.1987); *United States v. Cordero,* 992 F.2d 985, 986 n. 1 (9th Cir.1993); *Wheeler,* 795 F.2d at 841; *United States v. Wong–Alvarez,* 779 F.2d 583, 585 (11th Cir.1985).

Thus, the court must review the record in light of Defendant's arguments and explain why her motion for release pending appeal is denied. *See, e.g., United States v. Swanquist,* 979 F.Supp. 679 (N.D.Ill. 1997) (denying release after second remand).

## III. SUMMARY OF THE INDICTMENT

As already noted, the Government's 12–count indictment included allegations that Defendant engaged in a scheme to defraud the City for her political advancement and that she attempted to extort contributions from brokerage firms for the Democratic Party of Illinois.

First, the Government alleged a scheme to defraud in which Defendant, while acting in her official capacity as Treasurer, made decisions that were not in the best financial interests of the City, but instead were based upon the financial interests of her campaign for Illinois Attorney General and of the Democratic Party of Illinois. One charge was that Defendant allegedly diverted City Treasurer Office ("CTO") resources, including employees' time, away from City business in order to assist her campaign for Attorney General and to solicit contributions. Defendant also allegedly made decisions about certain programs based on whether those decisions could further her campaign. For instance, Defendant allegedly "sought to induce Citibank to host a fundraising event and to make a contribution to her campaign through reference to the contract [that Citibank had with the City to provide custodial services for approximately $1.4 billion in assets]." (See Indictment ¶ 1h, ¶ 12.)

The Government further alleged that between July 2, 1998, and September 18, 1998, Defendant directed the CTO to cease doing business with (or "blacklist") seven brokerage firms (Fuji Securities, Pryor McClendon, Inc., Paine Webber, D.H. Brush & Associates, Everen Securities, Smith Barney, and SEI Investments) based on their refusal to satisfy Defendant's requests for contributions. Consequently, on at least 20 occasions during that period, the City allegedly did not invest funds at the highest rate possible, leading to the loss of approximately $16,000 in interest income.

These allegations were incorporated into the Government's specific charges of mail and wire fraud. To that end, the Government alleged that on numerous occasions, Defendant used the United States Mail in furtherance of her scheme to defraud by sending (Counts I, II, VI, and VII) and receiving (Count III) mail to and from various financial institutions. *See* 18 U.S.C. § 1341. The Government also alleged that on two days in June 1998, Defendant, in furtherance of her scheme to defraud, directed telephone calls to be placed to two investment offices outside of Illinois (Pryor McClendon (Count IV) and Bank One (Count V)) in order to acquire $10,000 contributions for the Democratic Party of Illinois. *See* 18 U.S.C. § 1343.

Finally, the Government alleged that during June 1998 Defendant attempted to extort, by wrongful use of fear of economic harm, *see* 18 U.S.C. §§ 1951, 1952,[5] $10,000 contributions for the Democratic Party of Illinois from five of the seven brokerage firms listed above: (1) Fuji Securities (Count VIII); (2) Pryor McClendon, Inc. (Count IX), (3) Paine Webber (Count X), (4) D.H. Brush & Associates (Count XI), and (5) Everen Securities (Count XII).[6]

## IV. SUMMARY OF THE EVIDENCE AT TRIAL

The Government began its case in chief by presenting evidence of Defendant's attempted extortion of brokerage firms. The first witnesses to testify were employees of Fuji Securities in Chicago. The Fuji employees testified how John Henry ("Henry"), the First Deputy Treasurer, telephoned to request a $10,000 contribution for the Illinois Democratic Party, and repeatedly called back in pursuit of the money. After one of his requests was denied on June 4, 1998, Henry transferred his call with Eugenie Polhorsky ("Polhorsky"), a junior sales associate at Fuji, directly to Defendant. The following conversation, recorded by Fuji as part of its routine practice of recording incoming calls, ensued:

Defendant: Yeah, hi, Genie. It's Miriam Santos.

Polhorsky: Hi, how are you?

Defendant: I'm fine.

Polhorsky: Good.

Defendant: Uhm, I'm calling regarding the status of our request for the Illinois Democratic Party.

Polhorsky: Mmm-hmm.

Defendant: And, uhm, wondering, what was going on with that.

Polhorsky: Oh, uhm, although we fully support you as a candidate, we regret that we're not, unable to contribute to your, uh, to that organization.

Defendant: And why is that?

Polhorsky: Uh, well, uhm, it has to go further up and the, uh.

Defendant: Okay, then I'm gonna urge you to take that request further up.

Polhorsky: Mmm-hmm.

Defendant: I'm going to urge you strongly.

---

**5.** *See generally United States v. Crockett*, 979 F.2d 1204 (7th Cir.1992); *United States v. Stodola*, 953 F.2d 266 (7th Cir.1992); *United States v. Nedza*, 880 F.2d 896 (7th Cir.1989); *United States v. Lisinski*, 728 F.2d 887 (7th Cir.1984).

**6.** The jury found Defendant guilty on all five counts of mail fraud (I, II, III, VI, VII) and one count of attempted extortion (VIII–Fuji), but acquitted Defendant on the remaining counts of attempted extortion (IX, X, XI, XII) and the two counts of wire fraud (IV and V).

Polhorsky: Mmm-hmm.

Defendant: To not blow off this request as you've blown off any request from my campaign in the past.

Polhorsky: Well.

Defendant: The Illinois Democratic Party is a completely different entity.

Polhorsky: Mmm-hmm.

Defendant: It is not bound by any S.E.C. rule or any other rule.

Polhorsky: Mmm-hmm.

Defendant: To accept contributions.

Polhorsky: Okay.

Defendant: Inasmuch as Fuji has in the past been not cooperative in helping me out. Now this request is from the State Democratic Party and I'm gonna urge you. I'm going to urge you very strongly, to appeal that and to find out who we need to talk to get a positive response.

Polhorsky: Okay. I will do that.

Defendant: And I need an answer ASAP.

Polhorsky: Alrighty.

Defendant: And, uhm, I, I do not know how to emphasize to you that this request is incredibly important.

Polhorsky: Mmm-hmm.

Defendant: That in the past, I have been more than tolerant of no's and no shows. That I have been a good customer. That the Illinois Democratic Party is not an entity that you are barred in any shape or form or sense [sic.].

Polhorsky: Mmm-hmm.

Defendant: Uhm, a, a lack of response to me indicates that you are just unwilling to be cooperative and I just don't understand it.

Polhorsky: Mmm-hmm.

Defendant: Because I think I've been a good (UI) [Unintelligible] urge you (UI). (STATIC)

Polhorsky: Miriam? (UI)

Polhorsky: Something's happening. Are you there?

Defendant: Yes, I'm here.

Polhorsky: Okay. Sorry. No, we, uhm, you know, it's just not the situation and, and we fully support you and I, I personally do.

Defendant: In what sense. In what sense.

Polhorsky: I personally do. I mean, you know, I've, I've contributed to your campaign.

Defendant: You know what? And I appreciate the small contributions we've received in the past, but you know what? This is a campaign.

Polhorsky: Mmm-hmm.

Defendant: And, you know, when I get a call from the speaker of the house who is now the head of the Illinois Democratic Party.

Polhorsky: Mmm-hmm.

Defendant: I have to be able to offer to do my part as a good Democrat.

Polhorsky: Mmm-hmm.

Defendant: And when I ask the people that, you know, that I know ought to be able to, without a blink of an eye, be supportive and they're not, I have a problem with that.

Polhorsky: I understand that.

Defendant: Because we have, I, you have never had this conversation with me before, but you're having it now because I wanna urge you to really consider this request and consider it strongly.

Polhorsky: Okay. I will bring it up, I just wanna let you know personally, I'm there for you, but I will make that request. You know, and it's not like we're trying to hold back anything and we'll see what we can do. I'm not trying to ignore your request. I just wanna let you know that. Personally, I, you know, it's not in my hands right now.

Defendant: I don't understand why the firm is so recalcitrant to help the people that helped them. I really don't.

Polhorsky: Yeah.

Defendant: And it has nothing to do with you personally. This is a firm issue.

Polhorsky: Mmm-hmm.

Defendant: This is absolutely and unequivocally a firm issue. When they came in here and sat in my office and asked for business and asked for help, we were there. Never asked for a damn thing.

Polhorsky: Mmm-hmm.

Defendant: Now every time I ask, I get oh, well, you know the G–37 and all that stuff that doesn't even apply to me.

Polhorsky: Mmm-hmm.

Defendant: And then they're willing to say okay, fine, But this is a little different. This is the Illinois Democratic Party. You're not precluded. There is no issue. If you want, I'll give you the name of their lawyer that they can talk to.

Polhorsky: Oh, no, I understand that.

Defendant: Who they can debate the law with.

Polhorsky: Mmm-hmm.

Defendant: But this is not a choice.

Polhorsky: Okay.

Defendant: You know I'm tired of it.

Polhorsky: Mmm-hmm.

Defendant: And, you know, I don't like to get on this phone and have to ask for contributions because its just ridiculous. It shouldn't ever have to get to this point and I'm really kind of frustrated by it. I really am.

Polhorsky: I understand.

Defendant: When they sat in here and asked for my time and asked for my help and asked for my business, I was there. Now it's time for people to belly up.

Polhorsky: Okay.

Defendant: And if you could take that up and give me a response real quick, I would appreciate it.

Polhorsky: I will.

Defendant: Thank you.

Polhorsky: Bye.

(Gov. Trial Ex. Fuji 3A.)

Ultimately, Fuji refused to contribute, as did numerous other brokerage firms. Henry testified (under a grant of immunity) that Defendant therefore ordered him to cut off the brokerage firms that refused to contribute to the Democratic Party of Illinois. According to Henry, Defendant's order came as she reviewed a list of the brokerage firms that did business with the CTO. Henry later communicated the cut-off order to Patricia Errera ("Errera"), the CTO's Chief Fund Manager, and Samuel Wright ("Wright"), Deputy Treasurer of Investments and Pensions.

In addition to Henry, other CTO employees such as John Galante ("Galante"), the Coordinator of Economic Development, and Eugenia Krzyzanski ("Krzyzanski"), an assistant to the Treasurer, testified about the cut-off. Galante stated that he was present when Defendant asked for a list of firms that did business with the CTO and that he understood that she wanted the list in order to cut off City business to firms that failed to contribute. As for Krzyzanski, she testified that she overheard Defendant's telephone conversation with Polhorsky and that within days she heard Defendant tell Henry to "cut them [Fuji] off."

With respect to the alleged fraudulent use of City resources, Galante testified that on average he spent 65% of his work days working on Defendant's campaign matters at her direction. In addition to Galante, the following CTO employees testified that they performed campaign work on City time at Defendant's direction: (1) Henry; (2) Krzyzanski; (3) Wright; (4) Colleen Brayer ("Brayer"), a former assistant to the Treasurer; (5) Laurie Dittman ("Dittman"), a Deputy Treasurer; and (6) Laura Gonzalez ("Gonzalez"), an executive secretary at the CTO. Another witness, Jackie Nehs, Defendant's scheduler until 1997, stated that she quit because she did not want to perform all the campaign-related duties that Defendant had required

her to perform during the 1995 campaign for Treasurer.

Additionally, the Government presented, *inter alia*, evidence of attempts to acquire contributions from Citibank. Samuel Borowski, a Citibank executive, testified that Defendant pressured Citibank to make contributions to the Democratic Party of Illinois and described how she responded with implicit threats to terminate a Citibank contract after Citibank refused to contribute.

After the Government rested, Defendant testified in her own defense. During her testimony, Defendant denied ever uttering the words "cut them off" while in the CTO. Defendant also accused Henry and the other witnesses of lying on the stand. Defendant further explained that she did not intend to extort Fuji or any other brokerage firms. According to Defendant, she was simply urging Polhorsky to take the matter up with higher authorities at Fuji. Defendant further claimed that the tone of her voice in the recordings resulted from a medical condition and an aspect of her personal character.

The foregoing is merely a brief summary of the evidence. Though the trial record is extensive, the court discusses additional testimony and evidence when addressing Defendant's arguments.

## V. DISCUSSION

As already noted, Defendant argues that there are numerous substantial questions of law or fact upon which the appellate court is likely to reverse her conviction on all counts or order a new trial. Specifically, Defendant contends that: (1) several of the court's evidentiary rulings deprived her of a fair trial; (2) the Government's misconduct during its rebuttal argument resulted in an unfair trial; (3) the court's refusal to continue the trial date violated her Sixth Amendment right to counsel of choice; (4) the court improperly excluded three critical defenses; (5) the court erroneously permitted specific evidence involving an episode with Citibank, N.A., that, coupled with the Government's improper

reference to that evidence during closing argument, resulted in an unfair trial. The court addresses each argument in turn.

### A. Defendant's Challenge of the Court's Evidentiary Rulings

"A district court's evidentiary rulings are matters within the court's discretion; [an appellate court] will overturn them only when the [district] court has abused that discretion." *United States v. Heath*, 188 F.3d 916, 920 (7th Cir.1999); *see also United States v. Mancillas*, 183 F.3d 682, 705 (7th Cir.1999); *United States v. McCulley*, 178 F.3d 872, 875 (7th Cir. 1999). "A court abuses its discretion in admitting evidence only when no reasonable person could agree with its rulings." *United States v. Amerson*, 185 F.3d 676, 683 (7th Cir.1999) (internal quotation marks and citations omitted). The Federal Rules of Evidence are essentially rules of inclusion, *see United States v. Thomas*, 987 F.2d 697, 706 (11th Cir.1993) ("the Federal Rules of Evidence generally favor the inclusion rather than the exclusion of evidence."), with an end toward attaining the truth. Indeed, Rule 102 of the Federal Rules of Evidence provides:

> These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

*Id.*

Further, an appellate court "afford[s] *great deference* to the district court's judgment." *McCulley*, 178 F.3d at 875 (emphasis added) (*citing United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir.1995); *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.1991)). The Seventh Circuit recently described the expanse of this deference, stating that " '[a]ppellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass

through the eye of the needle.'" *United States v. Coleman,* 179 F.3d 1056, 1061 (7th Cir.1999) (*quoting United States v. Emenogha,* 1 F.3d 473, 477 (7th Cir.1993)). The appellate court, however, will reverse when the district court's evidentiary ruling is "fundamentally wrong." *Council 31, Amer. Fed. of State, County & Mun. Employees v. Doherty,* 169 F.3d 1068, 1074 (7th Cir.1999) (*quoting Williams v. Chicago Bd. of Educ.,* 155 F.3d 853, 857 (7th Cir.1998)); *see also* Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . .").

### (1) CTO Employees' Testimony that Defendant Ordered Cut–Offs

█ Defendant first argues that there is a substantial issue as to whether the court should have permitted witnesses to "speculate" on "the central issue in the case: whether Santos or Henry had ordered the cut-off [of brokers]." (Mem. in Supp. at 3.) Defendant contends that virtually every witness from the CTO infected the jury's evaluation of the issue when they were permitted to testify that there was "no doubt in [their] minds" that Defendant ordered the cut-off. (*Id.*) Defendant claims that the testimony was inadmissible speculation that ultimately prejudiced the outcome of the trial.

At trial, the following CTO employees testified that the order to cut-off brokers came from Defendant:

**Euginia Krzyzanski:**

Q. Where were you when you overheard the conversation between Miriam Santos and John Henry?

A. I was sitting at my desk.
\*\*\*

Q. Did you overhear any portion of the conversation?

A. When they came out of her private office, they were standing in front of Colleen's desk, and the Treasurer said: "Cut them off."

Q. Can you repeat that?

A. The Treasurer said: "Cut them off."

Q. Based upon the portion of the conversation that you overheard, to whom did you understand the Treasurer to be referring to?

[objection overruled]

Q. Based upon the portion of the conversation you overheard, to whom did you understand the Treasurer to be referring?

A. To the phone call.

Q. The phone call that we just heard, Fuji No. 3?

A. Yes, sir.

(Trial Tr. at 550–51.)

**Samuel Wright:**

Q. Sometime in June up until the Fourth of July weekend—

A. yeah.

Q. —did you have a meeting with Mr. Henry and Ms. Errera?

A. Yes.

Q. And who was at this meeting besides the three of you?

A. Just the three of us.

Q. Where did the meeting take place?

A. In John Henry's office.

Q. Can you tell us very generally what the subject matter of this meeting was?

A. John Henry presented us with a list of brokers that he told us that the treasurer didn't want us to do business with.

Q. As you sit here now, do you specifically remember him saying that the treasurer did not want you to do business with them?

A. Yes.

Q. Do you remember the names of the firms Mr. Henry said that treasurer did not want you to do business with?

A. No, not all of them. There was just three that comes to mind. That's

Fuji, Pryor McLendon, and I believe Paine Webber.

\*\*\*

Q. Are you aware, Mr. Wright, of any legitimate business reason you were told not to do business with these particular firms.

(Trial Tr. at 605–07.)

*John Galante:*

Q. And what did you overhear Miss Santos say to Mr. Henry?

A. She asked Mr. Henry to obtain a list of how much business was being done with brokerage houses in the City of Chicago.

Q. And based upon what you personally overheard during that conversation, what was your understanding of the purpose of that request?

[objection overruled]

A. The purpose of that request was to, was to link business with campaign contributions.

Q. What happened in the office after that request? The treasurer's office, I am speaking generally, not Mr. Henry's office.

A. What happened in the office, it was my understanding that certain brokerage houses were forbidden from doing any more business from the treasurer's office.

(Trial Tr. at 1496.)

Q. Again focusing you on the period of June of 1998, did you ever hear Miriam Santos use the phrase "belly up"?

A. Yes.

Q. How frequently did you hear her use that phrase?

A. On more than one occasion.

Q. What was your understanding of what she meant when she used that phrase "belly up"?

[objection overruled]

A. My understanding was that the firms that did do business with the treasurer's office needed to, needed

to make campaign contributions to her because of that business....

(Trial Tr. at 1500.)

Q. And what else if anything did she [Defendant] tell you about that campaign contribution she had received?

A. She told, she told me among other things that it was funny how they, how they contributed after they knew they would be cut off.

Q. What did you understand her to mean to be saying at that time to you on this phone?

A. That in some way it had been insinuated to them that they needed to make a contribution or their city business would be in jeopardy.

(Trial Tr. at 1501.)

*Patricia Errera:*

Q: Let me ask you this, Ms. Errera: At this June 11th meeting when Mr. Henry told you not to do business with these nine firms, what was his tone when he told you that?

A: He wasn't like—he seemed like he was upset, too. He understood—

\* \* \* \* \* \*

Q: What about what he was saying to you and how he said it made it appear that he was upset?

A: Because he agreed with me. He agreed that it wouldn't look good to cut these brokers off, but that there was no choice.

Q: Now, you mentioned that he said the orders came from the defendant; is that right?

A: Yes.

\* \* \* \* \* \*

Q: Was there any doubt in your mind, Ms. Errera, where the orders came from?

A: No.

Q: Why not?

A: Because of all the situations that have occurred in the office in the past. I've worked there five years.

Q: What do you mean by that?

A: Well, I know that in the office the decisions were made by Ms. Santos.

Q: Based on your five years in the office and your contact with him, how often would you have contact with him?

A: With Mr. Henry?

Q: Yes, ma'am.

A: On a daily basis.

Q: Was Mr. Henry the one who made the decisions, major decisions in the office?

A: No.

(Trial Tr. at 754–55.)

### Michelle Belcher (a CTO Fund Manager):

Q: Let's talk about June of 1998, Ms. Belcher. Did there come a time in the summer of 1998 when the investment group at the Treasurer's Office did not make trades to make the most money for the City?

A: Yes.

Q: What happened?

A: We were told not to do trades with certain brokers.

Q: Who told you that?

A: Patricia Errera.

\* \* \* \* \* \*

Q: In June of 1998, do you remember having a conversation with—conversations with Ms. Errera?

A: Yes.

\* \* \* \* \* \*

Q: And did Ms. Errera tell you where the orders had come from not to do business with certain brokers?

A: We pretty much knew where they came from.

Q: What do you mean by that?

A: Normally, she would come out of the office. John Henry would call her in his office, and they would have closed-door meetings. And when she would come out, then she would tell us not to do business with whatever broker there was and—

\* \* \* \* \* \*

Q: When you say she would tell you, are you talking about Ms. Errera?

A: Yes.

Q: What would she tell you about where the orders came from?

A: She would say John Henry stated that we could not do business with this broker.

Q: And was it your understanding that Mr. Henry gave the ultimate orders, Ms. Belcher?

A: No.

Q: Why is that?

A: I was understood [sic] that the direct orders came from Miriam Santos.

Q: Now you never personally heard Ms. Santos tell you that, did you?

A: No.

\* \* \* \* \* \*

Q: Mr. Belcher [sic], Mr. Gair asked you if Pattie Errera was the only source for your belief that the defendant had ordered you not to do trades with certain companies. Do you recall that question?

A: Not exactly.

Q: Well, in fact, that was the answer you gave. You said "not exactly when he asked you if Pattie Errera was the only way you knew it was her." Do you remember that?

A: Okay. Yes.

Q: Why did you say "not exactly"?

A: Because it was—normally, it was discussed in the office in the investments section between me and Robert and Patti. It was discussed as to why we could not do business with those certain brokers.

Q: Is there any doubt in your mind that the defendant ordered you not to do those trades?

A: There is no doubt.

(Trial Tr. at 1041–43, 1056–57.)

The court allowed this testimony under Rules 401, 701, and 406 of the Federal Rules of Evidence. *See* Fed.R.Evid. 401, 701, 406.

As a preliminary matter, the court notes that Defendant and Henry were joint venturers in raising campaign funds. Further, Defendant was a principal and Henry an agent. Accordingly, Defendant's admissions, as Henry relayed them, are admissible under Federal Rule of Evidence 801(d)(2)(D) & (E). *See* Fed.R.Evid. 801(d)(2)(D) & (E). As the court instructed the jury:

> An offense may be committed by more than one person. A defendant's guilt may be established without proof that the defendant personally performed every act constituting the crime charged. If a defendant knowingly caused the acts of another, the defendant is responsible for those acts as though she personally committed them.

(Trial Tr. at 2502.)

*(a) Rule 401*

The employees' testimony that Defendant ordered the cut-offs is relevant in demonstrating their state of mind while working in the CTO. For example, whether Wright was correct in his perception of activities at the CTO is of no moment, for his state of mind explains his daily conduct. Further, the testimony adds context to the developing factual scenario and assists the jury in understanding the operation of the CTO.

*(b) Rule 701*

And under Rule 701, the employees could testify to their perception of a standard practice in the CTO. (*See, e.g.,* Trial Tr. at 1063.) Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Fed.R.Evid. 701. Clearly, the inferences drawn by the CTO employees were rationally based on their perception and are helpful to a clear understanding of the facts at issue.

Additionally, the testimony of Wright, Galante and Dittman highlighted the fact that Defendant made all the decisions at the CTO:

**Samuel Wright:**

Q: Turning ahead, Mr. Wright, to June of 1998. Did there come a time, Mr. Wright, in June of 1998 when you were asked to make campaign solicitations?

A: Yes.

Q: And who at the Treasurer's Office asked you to make those solicitations?

A: John Henry.

Q: Did Mr. Henry tell you where the orders came from?

A: Yes.

Q: And who did he say the orders came from?

A: He indicated the treasurer would like for me to make the calls.

\*\*\*

Q: Was there any doubt in your mind where the orders came from?

A: No, there wasn't.

Q: Who were you asked to call?

A: The money managers from the pension funds.

\*\*\*

Q: And did you make any such calls, Mr. Wright?

A: Yes.

Q: What were you asking these pension-fund managers to do?

A: To contribute to the Democratic party as well as Ms. Santos' campaign for Attorney General.

\*\*\*

Q: Was anybody else from what you saw personally in the Treasurer's Office making similar telephone solicitations for the campaign?

A: John Henry.

Q: Was there any discussion between you and Mr. Henry about making these calls from City Hall in the Treasurer's Office?

\*\*\*

A: The only discussion was on a day-to-day basis where each morning, John would state that he has to go make his calls and he would ask if I made mine.

Q: And did it become sort of a joke in the office?

A: Basically, yes.

(Trial Tr. at 601–04.)

### John Galante

Q: You had an opportunity to observe her [Santos] in the, her day-to-day dealings with other people.

A: Yes.

Q: Her dealings with you?

A: Yes.

Q: Her dealings in how she managed her campaign?

A: Yes.

Q: And in that time, were you able to observe or witness her management style firsthand?

A: Yes.

Q: And what management style did you personally observe?

A: I observed that Miriam was what is commonly called as a micromanager.

Q: And what do you mean by micromanager?

A: Meaning that she wanted to be involved in every decision made in that, in the treasurer's office.

Q: What about her campaigns?

A: The same type of management style.

\*\*\*

Q: If I could direct your attention to October of 1997 through the period of June of 1998, the end of June.

A: Yes.

Q: You were in the office at that time, is that correct?

A: Yes.

Q: And during that period of time, did you have an opportunity to observe the office's practice and habit in terms of making decisions.

A: Yes.

\*\*\*

Q: Was it the practice of the office to make decisions without consulting Mariam Santos?

A: No.

\*\*\*

Q: Were you familiar with John Henry?

A: Yes.

Q: And again during the same period of time I would like to direct your attention to, October of 1997 through June of 1998, did you see Mr. Henry's style in the office?

A: Yes.

Q: And did you have an opportunity in that time period to observe his style and how he dealt with decisions in the office?

A: Yes.

\*\*\*

Q: Were you present when there were conversations between—How long did you work in the office? That's about a six or eight-month period that I am speaking of, October of '97 through June of '98?

A: Yes.

Q: And during that time, did you have an opportunity to personally ob-

serve the interaction between Mariam Santos and John Henry?

A: Yes.

\*\*\*

Q: And during that time, how much contact on a day-to-day basis would you have with the two of them?

A: A good amount.

Q: And during that time, did you have an opportunity to observe how they interacted in terms of decisions together?

A: Yes.

\*\*\*

Q: Was it Mr. Henry's habit or routine to make important decisions without consulting Mariam Santos?

A: No.

Q: And did that habit or routine differ with how he dealt with the treasurer's office and the campaign matters?

A: No.

Q: What was you understanding as to the reason for the habit and routine of the office from what you personally observed? Why did people not make decisions without consulting with Mariam Santos?

\*\*\*

A: It was my observation that people were afraid to make decisions in the office without consulting Mariam.

Q: And what was your understanding of what that fear was based upon?

A: It was based upon making the wrong decision and consequently, consequently having repercussions.

Q: Were you personally fearful of Miss Santos?

A: Yes.

Q: Was it your understanding that other employees were fearful?

A: Yes.

(Tr. Trans at 1460–66.)

***Laurie Dittman:***

Q: Was Mr. Henry, from what you say and what you personally observed, a decision-maker?

A. No.

Q. Who was the decision-maker in the office from what you personally observed?

A. The treasurer.

Q. And by that do you mean Miriam Santos?

A. Yes.

(Trial Tr. at 1054–55.)

Other considerations also support the admission of CTO employees' testimony identifying Defendant as the decision-maker in the CTO. First, defense counsel told the jury in his opening statement that Defendant cut the number of employees in the CTO from 30 to 14 during her tenure. (*See* Trial Tr. at 22.) Furthermore, Henry testified that he even lacked the authority to approve vacation time for the employees he supervised and that he had very little discretion to make decisions on behalf of the CTO. (*See id.* at 215.) Henry also testified that Defendant told him more than once to keep his opinions to himself. (*See id.* at 336.) In one instance, as Henry recalled on cross-examination, Defendant asserted her authority:

Q. And she told you: "If you can't keep your mouth shut, just stay in the car," isn't that right?

A. Actually, the words were: "When are you going to learn to shut your f-ing mouth"?

*The Court:* What words did she speak?

A. "When are you going to learn to shut your fucking mouth?"

(Trial Tr. at 376.)

This testimony and the testimony of the other CTO employees (Krzyzanski, Wright, Errera, Belcher, Galante, and Dittman) are based on their perceptions

and assist in understanding the operations of the CTO. Therefore, the testimony of these witnesses was admissible under Rule 701.

Defendant, however, argues that the court's rationale, particularly the court's finding that the testimony is admissible as evidence of "standard practice" under Rule 701, is "flatly wrong." (Mem. in Supp. at 4.) Defendant attacks the employees' testimony that, based on standard practice in the CTO, Henry would not have cut off brokers unless Defendant told him to do so. According to Defendant, this testimony was inadmissible because the employees failed to satisfy Rule 701's personal knowledge requirement. Relying on *Stagman v. Ryan*, 176 F.3d 986 (7th Cir.1999), Defendant characterizes the testimony as mere speculation.

In *Stagman*, the plaintiff in a civil rights lawsuit alleged that the Attorney General of Illinois was involved in his allegedly wrongful termination. 176 F.3d at 990–92. To support his contention, the plaintiff submitted the affidavit of the office's personnel director, who stated that based on standard practice, the plaintiff would not have been fired without the Attorney General's knowledge and express approval. *See id.* at 995–96. According to the director, the Attorney General would have been directly involved in the termination decision because the plaintiff was a close relative of a state legislator and a candidate for a union presidency. *See id.*

The district court excluded these statements and granted summary judgment in favor of the Attorney General's Office. *See id.* The Seventh Circuit affirmed, finding that the plaintiff failed to show that the director had personal knowledge of the statements in the affidavit. *See id.* The Seventh Circuit characterized the statements as "mere speculation and, as such, a meaningless assertion." *Id.* at 996.

The court finds Defendant's reliance on *Stagman* unavailing. The Rule 701 issue in *Stagman* arose in the context of an affidavit submitted in opposition to a motion for summary judgment; whether the affiant actually had knowledge of the facts asserted in his affidavit is unclear. Here, by contrast, the record includes sufficient foundations to satisfy the requirements of personal knowledge as to the operations of the CTO. Indeed, the CTO employees worked in a small office on a daily basis and thus had more than adequate opportunity to observe and perceive the interaction between Henry and Defendant. With these foundations, the employees were in a position to provide lay inferences about the identity of the person who ordered the cutoffs; those inferences were therefore hardly "meaningless assertions."

And unlike *Stagman*, Defendant's attorneys had the opportunity to cross-examine the employees about their personal knowledge. As the Seventh Circuit noted in *United States v. Allen*, 10 F.3d 405, 414 (7th Cir.1993),[7] after acknowledging that the basis for a witness's knowledge was not overwhelming:

> Rule 701 places great reliance on a party's ability to cross-examine an opponent's witness and present any weaknesses in the witness's testimony to the trier of fact. *United States v. Lawson*, 653 F.2d 299, 303 (7th Cir.1981). 'The trier of fact can normally be depended upon—with the aid of counsel—to pick up the nonverbal signals which, although absent from the record, indicate fairly clearly what he saw and when he is describing what he thinks happened; the trier of fact also should generally be depended upon to give whatever weight or credibility to the witness' opinion as may be due.' 2 Jack B. Weinstein and

7. In *Allen*, the defendant, who was politically-connected, was charged with protecting a gambling operation. A witness testified that he "assumed ... that he [the defendant] would continue to do favors for us, protecting our gambling spot, because he was anticipating that we could do him a favor." 10 F.3d at 414. The district court admitted this opinion testimony under Rule 701, despite the defendant's objections that the testimony was speculative and based on "assumptions." *See id.* The Seventh Circuit affirmed. *See id.*

Margaret Berger, *Weinstein's Evidence* ¶ 701[02], at 701–32 (1993).

Here, defense counsel grasped his opportunity to cross-examine and vigorously tested the employees' personal knowledge.

As for Rule 701's second requirement (*i.e.,* the witness's opinions are helpful to a clear understanding of the witness's testimony or the determination of a fact in issue), *Allen* is again instructive. The *Allen* court noted that where testimony dwells into the critical issues of the trial, the district court must assess the relationship of the opinion to the issues when weighing the value and need of the opinion. 10 F.3d at 414. The appellate court also noted that whether to allow particular testimony is ultimately a judgment call by the district court, concluding:

> "The closer the subject of the opinion gets to critical issues the likelier the judge is to require the witness to be more concrete ... because the jury is not sufficiently helped in resolving disputes by testimony which merely tells it what result to reach." 2 *Weinstein's Evidence* ¶ 701[02], at 7–1–25; *see also* David W. Louisell & Christopher B. Mueller, *Federal Evidence,* § 376, at 622–23 (1979). "[M]eaningless assertions which amount to little more than choosing up sides," such as statements that a defendant is "guilty," are properly excluded by the helpfulness requirement. Fed.R.Evid. 701, Advisory Committee Note; *see also* Louisell & Mueller, *supra,* § 376, at 620.

> But ultimately, the question of whether a lay opinion falls into the category of "meaningless assertion" or whether that opinion actually will help the jury decide an issue in the case is a judgment call for the district court.

*Allen,* 10 F.3d at 414–15; *see also Graham, Handbook of Federal Evidence,* § 701.1 at 602–11 (3d ed.1991) (and cases cited therein). Here, the court found that the testimony of the CTO employees was helpful to the jury in identifying the person who ordered the cut-offs of brokerage firms.

In short, the court concludes that Defendant fails to show a substantial issue regarding the admissibility of CTO employees' testimony under Rule 701.

### (c) Rule 406

■ In addition, the court properly admitted the testimony of the CTO employees under Rule 406. Rule 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed.R.Evid. 406. "To admit evidence of routine practice ... the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that was 'semi-automatic' in nature." *Cusumano v. NRB, Inc.,* No. 96 C 6876, 1998 WL 673833, at *2 (N.D.Ill. Sep.23, 1998) (*citing Simplex, Inc. v. Diversified Energy Sys., Inc.,* 847 F.2d 1290, 1293 (7th Cir.1988)). This requirement helps prevent attempts to sneak in inadmissible character evidence under Rule 404, *i.e.,* evidence used to establish a party's propensity to act in conformity with her general character, as habit or routine practice evidence. *See Simplex,* 847 F.2d at 1293.

As already noted, the testimony from the CTO employees is based on their day-to-day perceptions of the chain of command and practice of the CTO's operation. Part of the routine practice at the CTO, according to the testifying employees, was that Defendant made all the important decisions. The testimony was sufficiently specific to establish the frequency of the conduct, and it establishes more than a mere tendency to act in a given manner. Accordingly, the CTO employees could testify that based on their perceptions of the standard practice and operation of the

CTO, Defendant issued the orders to cut-off the brokerage firms.

For these reasons, the court rejects Defendant's argument that the admission of certain testimony of the CTO employees is a substantial issue for appeal likely to result in reversal or an order for a new trial.

### (2) Admissibility of Written Narratives

■ Next, Defendant contends that the court incorrectly admitted: (1) a June 10, 1998 letter from Errera to Michael Haggerty ("Haggerty"), the Deputy Director of the City of Chicago Board of Ethics ("the Board"), [referred to as "BOE 3"]; (2) a June 11, 1998 letter from Errera to Haggerty, ["BOE 4"]; (3) notes that Steve Berlin, a Board employee, took pursuant to a telephone conversation with Errera, ["BOE 5"]; and (4) "diary entries kept by one of the brokers" ("PMC 1", "PMC 2"). (Mem. in Supp. at 5–6.) Upon review of these exhibits, the court finds that they were properly admitted at trial.

### (a) Errera's June 10, 1998 Letter to the Board (BOE 3)

Defendant first argues that the court improperly admitted BOE 3 (Errera's June 10, 1998 letter to Haggerty). In BOE 3, Errera describes campaign activity in the CTO and a meeting with Wright, in which Wright told Errera that she could not execute investments with three brokerage firms. Although Defendant generally asserts that BOE 3 is inadmissible as a business record or a present sense impression, she fails to support these contentions and provides no citations to the record. (See Mem. in Supp. at 5.) Defendant also ignores that both Wright and Errera were subject to cross-examination. In any event, the court finds that BOE 3 was properly admitted.

■ The court conditionally admitted BOE 3 during the Government's direct examination of Errera. (See Trial Tr. at 737.) On cross-examination, however, defense counsel began questioning Errera about BOE 3. (See id. at 889–90.) At that point, the court admitted the document so that defense counsel could use it during his cross-examination. (See id. at 890.) Significantly, defense counsel did not object when the court admitted BOE 3, instead he immediately began to cross-examine Errera with it. (See id.) Accordingly, neither the court nor the Government expressly stated an independent basis for BOE 3's admission. Defendant cannot now insist that an independent basis for BOE 3's admission is required. Simply put, defense counsel's failure to object to BOE 3's admission at trial waives the issue here. See generally United States v. Stevenson, 6 F.3d 1262, 1266 (7th Cir.1993) (citing 3A Charles A. Wright, Federal Practice and Procedure, § 842 (2d ed.1982)); Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335, 1352 (7th Cir.1983).

### (b) Errera's June 11, 1998 Letter to the Board (BOE 4)

Defendant next argues that the court incorrectly admitted BOE 4 (a June 11, 1998 letter from Errera to Haggerty) as a present sense impression, see Fed.R.Evid. 803(1), and under the residual exception to the hearsay rule, see Fed.R.Evid. 807. (See Mem. in Supp. at 5); (Trial Tr. at 913.) BOE 4 describes a meeting with Errera, Henry and Wright, in which Errera allegedly was told to cease doing business with nine brokerage firms. The court again emphasizes that Errera was subject to cross-examination.

### (i) Rule 803

■ Rule 803(1) defines a present sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Fed.R.Evid. 803(1). A present sense impression is not excluded by the hearsay rule even though the declarant is available as a witness. See id. Three requirements must be met before hearsay evidence is admitted as a present sense impression: "(1) the declarant must have

personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous." *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir.1998); *see also United States v. Campbell*, 782 F.Supp. 1258, 1260 (N.D.Ill.1991) (*citing United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir.1982)); 4 J. Weinstein & M. Berger, Weinstein's Evidence P 803(1)[01], at 803–75–81 (1991). " 'The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication. There is no per se rule indicating what time interval is too long under Rule 803(1)....' " *United States v. Parker*, 936 F.2d 950, 954 (7th Cir.1991) (*quoting United States v. Blakey*, 607 F.2d 779, 785 (7th Cir.1979) (*overruled sub silentio on other grounds by Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990))).

BOE 4 satisfies the three requirements of a present sense impression. First, Errera personally attended the meeting she described in BOE 4. Second, Errera described the meeting factually. (*See id.*) Third, Errera's testimony and BOE 4 itself demonstrate that she drafted it immediately after the meeting occurred. For instance, Errera's testimony included the following exchange:

Q: Now, after this meeting did you do anything?

A: I left the meeting. I went back to my desk, and I typed up what had just occurred about the cutoff of the brokers.

Q: Did you do that immediately after?

A: Yes.

(Tr. 746.) And BOE 4 states: "June 11, 1998, I was just brought into a meeting with Mr. Henry and Mr. Wright...." (BOE 4.) In short, Defendant fails to show that BOE 4 was not contemporaneous, and she does not contend that it is unreliable due to defective recollection or conscious fabrication.

*(ii) Rule 807*

 And even if BOE 4 was inadmissible under Rule 803(1), it was admissible under Rule 807, the residual exception to the hearsay rule. *See* Fed.R.Evid. 807. Rule 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Thus, under the residual exception, "a hearsay statement must meet five requirements to be admissible: (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir.1999) (*citing Moffett v. McCauley*, 724 F.2d 581, 583 (7th Cir.1984)) (addressing the former Rule 803(24)). "Critical to the admission of a hearsay statement under [Rule 807] is a finding by the district court that the statement is trustworthy." *Id.* (*citing United States v. Romo*, 914 F.2d 889, 896 (7th Cir.1990); *Moffett*, 724 F.2d at 583). The non-exhaustive factors examined when determining a statement's reliability or trustworthiness are: (1) the probable moti-

vation of the declarant; (2) the circumstances under which the statement was made: (3) the knowledge and qualifications of the declarant; (4) the character of the declarant for truthfulness and honesty; (5) whether the testimony was made under oath and subject to cross-examination; (6) the declarant's personal knowledge of the facts in the statement; (7) whether the declarant recanted the testimony; and (8) whether the statement was corroborated. *See id.* at 1110–11.

First, the court found Errera's descriptions of campaign activities reliable and trustworthy. (*See* Trial Tr. at 913.) During the trial, Errera testified she was concerned about wrongdoing in the CTO and documented the occurrences she believed to be problematic. (*See, e.g., id.* at 669, 682–83). To that end, Errera recorded what occurred during the meeting in which she was told to cut off brokers.

Additionally, BOE 4 satisfies the other four requirements of Rule 807. The descriptions of Errera's meeting with Wright and Henry included in BOE 4 are material and probative, and its admission furthers the interests of justice for the following reasons. First, BOE 4 demonstrates Errera's state of mind· at the time CTO employees were campaigning for Defendant. Moreover, BOE 4 provides background as to why Errera recorded certain activities. BOE 4 is also relevant to show Errera's motivation behind her complaints to the Board. Furthermore, BOE 4 provides insight into the events which led to the investigation of Defendant; it provides background and chronology to assist the jury. Finally, the Government satisfied the notice requirement of Rule 807 by informing Defendant of its intention to seek BOE 4's admission under Rule 807 in its April 5, 1999 motion *in limine.* (*See* April 5, 1999 Govt. Mot. *in Limine* at 5.) For these reasons, the court properly admitted BOE 4 under Rule 807.

*(c) Notes of Board Employee Berlin (BOE 5)*

Defendant also objects to the admission of BOE 5 (the notes that Berlin took pursuant to a telephone conversation with Errera) on the basis that it is hearsay. At trial, the court made clear to the jury that BOE 5 was not offered for its truth:

Members of the·jury, you will·receive a copy of BOE 5.

Now, what Ms. Errera said to Mr. Berlin is not to be considered by you for its truth. You may take into account that this document and this witness are saying that she came to the ethics committee or commission. What she said to Mr. Berlin is not to be considered by you for. the truth of what she said. But you can take into account that she said it.

(Trial Tr. at 988–89.) Because BOE 5 was *not* "offered in evidence to prove the truth of the matter asserted[,]" *see* Fed.R.Evid. 801(c),[8] it was admissible.

*(d) Errera's Credibility and BOE 3, 4, and 5*

Additionally, the court admitted BOE 3, BOE 4, and BOE 5 to allow the Government the opportunity to rehabilitate Errera's credibility. During his opening statement, defense counsel vehemently attacked Errera's credibility as a Government witness. (*See* Trial Tr. at 50–54.) Specifically, defense counsel declared that Errera fabricated evidence against Defendant, that she referred to Defendant with unflattering names, that her pin-filled voodoo doll screen saver was a depiction of Defendant, and that she despised Defendant. (*See* Trial Tr. at 51–52.) Defense counsel also commented that Errera was worried that Defendant would discover that she received commission-free trades from a broker with whom the City did business. (*See* Trial Tr. at 53–54.)

---

**8.** Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the· trial or hearing, offered in

evidence to prove the truth of the matter asserted."

While defense counsel was entitled to suggest that Errera was biased against Defendant, his emphatic attacks on Errera's credibility opened the door to rebuttal evidence. Indeed, "[o]nce a witness's credibility has been attacked ... the non-attacking party is permitted to admit evidence to 'rehabilitate' the witness." *United States v. Lindemann*, 85 F.3d 1232, 1242–43 (7th Cir.1996) (*citing United States v. McKinney*, 954 F.2d 471, 478 (7th Cir.1992)); *see also United States v. McAnderson*, 914 F.2d 934, 945–46 (7th Cir.1990) (defense counsel's comment in his opening statement that alleged street gang was a group formed for religious purposes opened door for the Government to submit rebuttal evidence before the jury). BOE 3, BOE 4, and BOE 5 fall within the scope of rebuttal evidence.

### (e) "Diary entries kept by one of the brokers [Pryor McClendon]" (PMC 1, PMC 2)

Defendant also argues that the court wrongly admitted "diary entries kept by one of the brokers" as business records. However, because Defendant fails to refer to any part of the 2,500 page trial transcript, the court cannot identify with certainty the documents at issue. Defendant's failure arguably waives her challenge. *See Thompson v. Boggs*, 33 F.3d 847, 853 (7th Cir.1994); *see also Erff v. MarkHon Indus., Inc.*, 781 F.2d 613, 618 (7th Cir.1986) ("[T]he district court need not investigate the evidence for arguments that might possibly support [the plaintiff's] claim....") (*quoting Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir.1985)). Nonetheless, the court assumes that Defendant is referring to notes (referred to as "PMC 1" and "PMC 2") that Carol Mackoff ("Mackoff"), a senior vice president at Pryor McClendon, took immediately after telephone conversations she had with CTO employees.

### (i) Mackoff's Notes of June 3, 1998 Conversation with Henry (PMC 1)

Mackoff testified that she began taking notes on June 3, 1998, the day Henry called her to ask for a contribution to the Democratic Party of Illinois. (*See* PMC 1; Trial Tr. at 1681.) After Mackoff recorded notes of the conversation, she spoke with her boss, Ken Bruce ("Bruce"), who told her to write down exactly what was said. (*See* Trial Tr. at 1677–78.) Thereafter, and still within five to ten minutes of her conversation with Henry, Mackoff did so. (*See id.* at 1678–79.) Based on this testimony, the Government moved to admit Mackoff's initial notes and her written recollection of the conversation as "PMC 1."

Defense counsel objected, claiming that the portion of PMC 1 that Mackoff wrote at the direction of Bruce was a revision of her notes and thus hearsay. (*See id.* at 1679–80.) The court overruled defense counsel's objection, deeming PMC 1 admissible as a present sense impression, *see* Fed.R.Evid. 803(1), and under the residual exception to the hearsay rule, *see* Fed.R.Evid. 807. The court reasoned that Bruce directed Mackoff to write down exactly what was said and that Bruce did not order her to revise her notes. (*See id.* at 1680.)

### Rule 803(1)

The court did not err by admitting PMC 1. The three requirements of a present sense impression were satisfied, because: (1) Mackoff personally perceived the event described; (2) Mackoff's account of the conversation described the event; and (3) the declaration and the event described were contemporaneous. *See Mitchell*, 145 F.3d at 576; *Campbell*, 782 F.Supp. at 1260. Defendant offers nothing to suggest that the five to ten minute interval was too long a time to be considered contemporaneous, nor does she offer any arguments that PMC 1 is unreliable. *See Parker*, 936 F.2d at 954 (citations omitted).

*Rule 807*

Furthermore, even if PMC 1 was inadmissible under Rule 803(1), it was admissible under Rule 807. PMC 1 satisfies the five requirements of Rule 807 because it: (1) is trustworthy; (2) is material; (3) has probative value; (4) furthers the interests of justice; and (5) was admitted pursuant to notice. *See Hall,* 165 F.3d at 1110. Defendant offers nothing to suggest otherwise, and the court finds no error in PMC 1's admission.

### (ii) Mackoff's Notes of July–September 1998 Conversations with CTO (PMC 2)

To the extent that Defendant challenges the admissibility of PMC 2, her objection is without merit. PMC 2 is a compilation of notes that Mackoff took as she communicated with the CTO from July to September 1998. When the Government offered PMC 2 into evidence as a business record, defense counsel objected on the same grounds as its objection to PMC 1. (*See* Trial Tr. at 1688.) The court overruled defense counsel's objection on the grounds that PMC 2 was a business record.

"A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records." *See United States v. Given,* 164 F.3d 389, 394 (7th Cir.1999) (citations omitted). Because Bruce directed Mackoff to document her contacts with the CTO in order to protect Pryor McClendon (*see* Trial Tr. at 1686–87), PMC 2 satisfies the requirements of a business record.

Moreover, after PMC 2's admission, defense counsel cross-examined Mackoff about her notes. Although Mackoff stated that creating a log such as PMC 2 was not normal business practice (*see* Trial Tr. at 1705), such a statement goes toward the weight given to PMC 2 and not its admissibility. Defense counsel did not ask the

court to readdress PMC 2's admissibility at that point.

In sum, the court finds no error in its admissions of BOE 3, BOE 4, BOE 5, PMC 1, or PMC 2. Accordingly, Defendant fails to show any substantial issues that would likely lead to reversal or an order for a new trial on appeal.

### (3) Karen Henry's Testimony about her Husband's Receipt of Cash from Brokers

■ Defendant argues that the court erroneously permitted Henry's wife, Karen Henry, to testify about allegedly prior consistent statements that her husband made about cash he received from brokers. After Henry had testified that the money he received was for the benefit of Defendant, Defendant denied the allegation on direct examination. The Government then called Karen Henry to rebut Defendant's denial. Karen Henry testified that her husband told her prior to August 12, 1998 (the date the FBI contacted Henry) that he received cash from brokers and that the cash was intended as a campaign contribution to be used for furniture at Defendant's campaign office. (*See* Trial Tr. at 2226.) According to Defendant, the Government inaccurately claimed that Karen Henry's testimony addressed a prior consistent statement by her husband because Henry had told the jury on redirect that he had no idea what happened with the money, except that he speculated that Defendant used it when she went out of town.

The court excerpts the relevant testimony here:

**John Henry:**

(cross-examination)

Q: Now, Mr. Henry, you testified on direct examination that you never got anything personally out of your work with the brokers; is that correct?

A: Not to my knowledge.

Q: Well sir, isn't it a fact that you have received cash from brokers?

A: Yes, I have.

Q: And you have received payments from a broker named Mike Hollendoner, have you not, sir?

A: Yes, I did.

Q: And sir, you never told the government that you had received cash from Mike Hollendoner, did you, sir?

A: I did not.

\* \* \* \* \* \*

Q: Did you ever tell anyone before right now that you received cash payments from Mike Hollendoner?

A: I had that conversation with my attorneys, yes.

Q: No one else from the government?

A: Not to my knowledge.

\* \* \* \* \* \*

Q: Are there any other people who have given you cash, Mr. Henry?

A: Yes, one other person I'm aware of.

Q: And that is Mr. Burns at Raymond James?

A: That is correct.

Q: He has given you payments?

A: Yes, he has.

Q: Did you ever tell the FBI about the payments he gave you?

A: Did not.

(Tr. Trans 485–87)

\* \* \* \* \* \*

(Re-direct examination)

\* \* \* \* \* \*

Q: Why don't you tell us why you took the cash and for what purpose. I don't believe Mr. Gair asked you that.

A: I took the cash on behalf of the Treasurer's campaign.

Q: And how did you receive the cash from Michael Hollendoner and Mr. Burns of Raymond James?

A: They would have been in envelopes.

Q: And it would have been a check?

A: No, it would have been cash.

Q: Actual cash in terms of U.S. currency?

A: Yes, sir.

Q: And what did you do with that money after you received it?

A: I turned it over to the City Treasurer.

Q: And where did Ms. Santos keep those envelopes of cash, if you know?

A: She has a private ante office, and she kept them in the safe there.

Q: A safe in the office?

A: Yes, sir.

Q: Were those monies kickbacks to you, as Mr. Gair implied in his questions?

A: No, sir.

Q: Were those monies for your benefit?

A: No, sir.

Q: When you said you took cash money, for whose benefit did you accept those cash contributions?

A: For the campaign.

Q: And were those cash contributions in excess of the $1,500 limit that Ms. Santos could have accepted from those individuals?

A: Yes, they were.

Q: Now, Mr. Gair asked you did you lie to the FBI or the Government, correct?

A: Yes, he did.

Q: Did we ever ask you about whether or not you had received cash from either of these firms?

A: You did not.

Q: Did we ever discuss those topics?

A: We did not.

Q: Did you ever falsely tell us something about those matters?

A: I did not.

\* \* \* \* \* \*

Q: And that cash, do you have any knowledge of what Miriam Santos did with it?

A: I do not.

Q: You have no idea if she spent it on what types of things she spent it?

A: She would take money if she was going out of town on trips or, you know, if she was taking business trips or something.

\* \* \* \* \* \*

(Recross-examination)

Q: Mr. Henry, how much cash did you take from Mike Hollendoner?

A: I believe it was about $7,500.

Q: Seven thousand five hundred in cash?

A: Yes, sir.

Q: And was that just one time, ever?

A: I believe that was one time.

Q: Did you ever get any other cash from Mr. Hollendoner?

A: Yes, we did.

Q: Over what period of time?

A: From '95 out.

Q: Thousands of dollars?

A: Yes, sir.

Q: And with respect to Mr. Burns of Raymond James, how much cash did he give you?

A: I'm not really sure of the amount.

Q: Was it in the thousands?

A: Yes, it was.

Q: Was it just one time Mr. Burns that gave you [sic.] cash?

A: No, it wasn't.

Q: Many times?

A: Yes, it was.

Q: And always in the thousands of dollars?

A: Yes, it was.

Q: Now, did you think that that was something that the government might be interested in knowing when you had all those debriefings with them?

A: I'm not sure what the government was interested in knowing.

Q: Well, wasn't the government asking you about campaign contributions?

A: They didn't ask me about cash.

Q: And you didn't tell them about cash?

A: I did not.

\* \* \* \* \* \*

Q: And now you say: "Oh, I gave it to Miriam."

A: And that's a fact.

Q: Uh-huh. Do you have any documents reflecting that?

A: I do not.

(Trial Tr. at 508–12.)

### Defendant's Testimony:

(Direct examination)

Q: Ms. Santos, you heard John Henry's testimony last week about him taking thousands of dollars in cash from brokers; is that true?

A: I heard the testimony.

Q: Did he ever tell you anything about getting cash before that minute?

A: Absolutely unequivocally not.[9]

9. This is one of several instances where the court found that Defendant falsely testified about a material matter, thus qualifying her for a sentence enhancement under U.S.S.G. § 3C1.1. *See United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *see also United States v. Hach*, 162 F.3d 937, 949 (7th Cir.1998) ("A defendant qualifies for an enhancement under § 3C1.1 if the district court finds he gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.") (internal quotation marks and citations omitted). Henry testified that he took cash from campaign contributors and then gave it to Defendant. Defendant's denials under oath that she received cash in this manner was not a mere denial of guilt; her testimony addressed specific activity.

Further, with respect to the cash, the court found that Defendant lied when she testified that she directed Henry to buy the furniture with a campaign check. (*See* Trial Tr. at 2587.) The vice-president of Hufford Furniture Company, Joseph Ballerine, recalled specifically during his testimony that that payment was in cash, with the balance paid on or about March 10, 1998. (*See id.* at 2208–10.)

Although Defendant issued a check allegedly to pay for the furniture, it was not cashed until March 16, 1998, rendering the testimony about the use of a check a complete falsehood. Additionally, Galante testified that Defendant ordered him to alter a D–2 statement (a required campaign disclosure form) that was filed with the Illinois Board of Elections to reflect that the check was used to purchase furniture. Specifically, Galante testified:

Q: Let me show you what's been marked as Government Exhibit Santos 13. At the same time, I'm going to give you Santos 14, but if you can just start with 13, if you would. The document that's marked Government Exhibit 13, do you recognize that?

A: Yes, I do.

Q: What do you recognize that to be?

A: A D2 campaign finance disclosure form.

Q: For what period of time does that D2 cover?

A: From January 1st, 1998, through June 30th, 1998.

Q: And for what account or what campaign organization does it relate?

A: The Friends of Miriam Santos.

***

Q: Can you please read aloud what the second-to-last entry on the form is?

A: It says, "Hufford Furniture Company, 310 West Washington Street, Chicago, Illinois 60606."

Q: Does it indicate the date that the expenditure allegedly occurred?

A: Yes.

Q: What is the date?

A: 3/10/98.

Q: Does it indicate the purpose?

A: Yes.

Q: What's it say?

A: "Office Furniture."

Q: Does it indicate the amount of the expenditure for the reporting period?

A: Yes it does.

Q: And what is the amount?

A: $7,532.87.

Q: Now, Mr. Galante, were you involved in the preparation of this D2, specifically that entry?

A: Yes.

Q: And when you initially prepared this D2, is that what was written there?

A: No.

Q: How did you prepare—what information did you use originally to prepare the D2?

A: I used the check registry.

Q: And now if I can ask you to look at Government Exhibit Santos 14, do you recognize that document?

A: Yes.

Q: What is that document?

A: It is the carbon copy from the check register.

Q: Of—and the date of that check is allegedly 3/10/98?

A: Yes.

Q: Is that the portion of the documents that you would have used to prepare the D2?

A: Yes.

(*Id.* at 2245–48.)

In light of this and other credible testimony contradicting Defendant's own testimony, the court found that she specifically lied on this point.

Moreover, the court found that Defendant's testimony that she never ordered a cut-off and that she never uttered the words "cut-off" was false and designed to influence the jury on material matters. (*See id.* at 2583.) Krzyzanski, an employee Defendant personally hired at the CTO, testified that she heard Defendant tell Henry to "cut them off." (*Id.* at 550.) Krzyzanski's testimony was credible and supported by the testimony of Henry and Galante, as well as documentation.

Further, the court found that Defendant lied when she testified that her intention during the Fuji call was merely to have Polhorsky take the contribution "request" to management. (*See* Trial Tr. at 2584.) The overwhelming evidence on the issue indicated that Defendant was attempting to extort Fuji, and Defendant committed perjury by falsely testifying about her mental state.

Next, the court found that Defendant lied when she conveyed to the jury that she disciplined Brayer for making various comments. The court found that Defendant deliberately attempted to undermine Brayer's testimony in an effort to influence how the jury would view her testimony. (*See id.* at 2585.)

Another of Defendant's lies was when she testified that she had not told Galante or Nehs that they would be giving up family time because they would be working on her campaign. (*See id.* at 2585.) This testimony was relevant to the issue of whether Defendant required CTO employees to work on her campaign on City time.

Defendant also testified untruthfully when she stated that she had a strict policy at the CTO that no one was to work on her campaign on City time. (*See id.* at 2585–86.) The overwhelming evidence to the contrary demonstrated that Defendant participated in campaign matters on City time and that she was aware of ongoing campaign activities in the CTO. For example, Defendant's Campaign Manager, Alton Miller, routinely met with Defendant in the CTO during regular office hours to discuss campaign matters. (*See id.* at 1801.)

The court further found that Defendant lied as to why she terminated the WSEP Program

Q: And did he ever give you any cash from brokers?

A: No.

Q: Did you have any knowledge that he had taken cash from brokers?

A: No.

(Trial Tr. at 1878.) Defendant then testified about drawing petty cash from her campaign accounts, sometimes in amounts of $1,500 or $2,500, and her practice of keeping the cash in her office safe. (*See* Trial Tr. at 1878–87.)

On cross-examination, the Government inquired about the cash contributions, alluding to Henry's testimony that Defendant once used the cash to purchase furniture for her campaign:

Q: In fact, Ms. Santos, you did receive cash from your campaign, didn't you?

A: I absolutely did not.

Q: In March of 1997 you decided that you wanted to buy some furniture for your campaign office, didn't you?

A: Yes, I did.

 * * * * * *

[After clarifying that the purchase was in March, 1998, the testimony continues:]

Q: Now that is pretty expensive furniture; isn't it?

A: We paid $7,000 for it, yes.

Q: And the way you obtained the money is that you told John Henry to go get $5,000 in cash from Mike Hollendoner and $2,500 in cash from Peter Burns; isn't that true, Ms. Santos?

A: That is not true. I gave John Henry a check for $7,500 and he went and bought the future [sic.].

Q: So it's your testimony that the check was used to buy the furniture?

A: Yes, it was.

(Trial Tr. at 2158–60.)

After the Government showed Defendant a bill for the furniture, she testified that she gave a check to Henry and that she did not know when or how the furniture store was paid. Defendant further denied accusations that the check made out to Henry was backdated and that she later attempted to conceal the events by ordering Galante to adjust a D2 form (a campaign disclosure form required by state law (*see* Trial Tr., Exh. Santos 13)) to show that the check was received by the furniture store and not Henry. (Tr. Trans at 2158–65.)

### Karen Henry's Testimony:

(Direct examination)

Q: Did you ever have any conversations prior to August 12 of 1998, prior to you or Mr. Henry ever meeting with the FBI in terms of this case, did you ever have any conversations with your husband about cash that he received from brokers.

A: Yes.

Q: And were those conversations prior to August 12 of 1998?

(a program to assist unemployed women) with the CTO. (*See id.* at 2586.) Dittman's testimony and various other documents demonstrate that Defendant's campaign interests influenced her decision to terminate an otherwise effective program.

Ultimately, the court, after hearing the testimony and considering the totality of the evidence, determined by a preponderance of the evidence that Defendant's testimony was not truthful. *See United States v. Mattison*, 153 F.3d 406, 412–13 (7th Cir.1998). Again, Defendant's testimony was not a mere denial of guilt; she testified untruthfully about numerous specific points. It is well-settled that a defendant has a right to testify, but not to lie. *See United States v. Emerson*, 128 F.3d 557, 563 (7th Cir.1997); *United States v. Osuorji*, 32 F.3d 1186, 1191 (7th Cir.1994). To this end, the Sentencing Guidelines punish defendants who commit perjury, not those who exercise their right to testify. Based on Defendant's perjurious testimony, the court imposed a two-point enhancement pursuant to U.S.S.G. § 3C1.1.

A: Yes, sir, they were.

Q: And what did your husband tell you about receiving cash from brokers, if you recall?

A: Well, the one instance, the most recent one would have been the furniture that was bought for the campaign office.

Q: Did he indicate whether or not that money was for him or for somebody else?

A: All he told me, it was for the furniture, given to Miriam as a campaign contribution for the furniture.

Q: And that was cash?

A: Yes, sir.

(Trial Tr. at 2226.)

After reviewing the transcript, the court again finds that Karen Henry's testimony about her husband's pre-August 1998 statements was admissible as a prior consistent statement. Under Rule 801(d)(1)(B), a prior consistent statement of a witness may be admitted if the following criteria are met: (1) the declarant testifies at trial and is subject to cross-examination; (2) the prior statement is consistent with the declarant's trial testimony; (3) the statement is offered to rebut an express or implied charge of recent fabrication or improper motive; and (4) the statement was made before the declarant had a motive to fabricate. *See United States v. Fulford,* 980 F.2d 1110, 1114 (7th Cir.1992); *United States v. Lewis,* 954 F.2d 1386, 1391 (7th Cir.1992).

Each of these elements was satisfied at trial; three of the elements are not in dispute. First, (John) Henry testified and was subject to cross-examination. Furthermore, Karen Henry's testimony about her husband's statements was offered to rebut an express charge of fabrication by defense counsel. Also, Henry allegedly made the statements before he had a motive to fabricate, *i.e.,* before he received immunity for his testimony from the Government.

Defendant's contention focuses on the second element, attacking Karen Henry's

testimony as inconsistent with her husband's. A close reading of the testimony, however, belies this claim. Simply put, Karen Henry's testimony is consistent because it shows that her husband took cash on behalf of Defendant, and it directly rebuts any claim of recent fabrication. In short, all the elements for the admission of a prior consistent statement under Rule 801(d)(1)(B) were satisfied. The court therefore finds no substantial issue for appeal.

### (4) Limitations on Cross–Examination of (John) Henry and Dittman

 Defendant next asserts that the court's limitations of the cross-examination of (John) Henry and Dittman are substantial issues for appeal. Defendant's argument is without merit.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused to "be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "Confrontation means more than being allowed to confront the witness physically.... 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (*quoting* 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed.1940)). That said, it is well-settled that "[t]he right to cross-examine adverse witnesses ... is not absolute because the Confrontation Clause guarantees only an opportunity for a thorough and effective cross-examination, 'not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Sasson,* 62 F.3d 874, 882 (7th Cir.1995) (*quoting Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)).

 Thus, while considering a defendant's rights under the Confrontation Clause, the district court retains a great

deal of latitude to impose limits on cross-examination; its rulings limiting cross-examination are therefore generally reviewed for an abuse of discretion. *See Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431; *United States v. Graffia*, 120 F.3d 706, 712 (7th Cir.1997). The district court may set "reasonable limits on the scope and extent of cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant." *Graffia*, 120 F.3d at 712 (*quoting Sasson*, 62 F.3d at 882). When a core value of the confrontation right is implicated, however, no deference is granted. *See United States v. Manske*, 186 F.3d 770, 777 (7th Cir.1999); *United States v. Scott*, 145 F.3d 878, 887–88 (7th Cir.1998). Thus, the court must distinguish core issues from the "more peripheral concerns which remain within the ambit of the trial judge's discretion...." *Graffia*, 120 F.3d at 712 (*quoting United States v. Hernandez*, 84 F.3d 931, 933–34 (7th Cir.1996)). To determine whether a core value is implicated, the focus turns to the "purpose of the cross-examination and the extent of the limitation." *Graffia*, 120 F.3d at 712; *see also Manske*, at 777.

### (a) Cross–Examination of Henry— Campaign Work in the CTO

With respect to Henry, Defendant argues that the court "precluded the defense from establishing through John Henry what he had previously told the FBI and had never retreated from: that no one in the CTO did a substantial amount of campaign work." (Mem. in Supp. at 6.) Specifically, defense counsel asked Henry: (1) "And the fact of the matter is, sir, that nobody in the Treasurer's office spent a significant amount of time on Miriam's campaign, did they?"; and (2) "Is it true that nobody at the Treasurer's office spent a significant amount of time on the campaign?" (Trial Tr. at 500.) The court sustained the Government's objections to both questions (*see id.*), noting the impropriety of the questions' form. (*See id.* at

502.) The court stated that the questions asked for legal conclusions from the witness, and lacked specificity and foundation. (*See id.*) Furthermore, the court noted that the Government restricted its direct examination of Henry, and ruled that questions asked on cross-examination were beyond the scope of the direct. (*See id.* at 502–03); *see also* Fed.R.Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."). Additionally, the court found that defense counsel's questions offered no assistance to the jury because they elicited conclusions about other employee's work activities. (*See id.* at 503.) As the court stated at trial:

> [T]he government's witness list contains numerous persons who work in the office, or didn't work in the office, and that may be the subject of cross-examination, that the employees themselves were subject to cross-examination about. But to ask this witness sort of a wrap-up question, and ask him as a general proposition whether certain work was going on in the office is improper.
>
> You've had a full opportunity to cross-examine this witness on his significant substantive testimony and have had more than an adequate and fair opportunity to attack his credibility. As to what was going on within the office in a more specific nature may be the subject of testimony by additional witnesses, and there is a long list available. And you will not therefore be deprived of finding out from those witnesses what they were doing or not doing within the office.

(*See id.*)

Under the circumstances, the court acted well within its discretion under Rule 611(b). *See* Fed.R.Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of

time, and (3) protect witnesses from harassment or undue embarrassment."). Furthermore, if Defendant suggests that Henry's prior statements to the FBI are those recorded in an FBI report, the argument is unavailing, for "a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them." *United States v. Leonardi,* 623 F.2d 746, 757 (2d Cir.1980) (*citing United States v. Rubin,* 609 F.2d 51, 62 (2d Cir.1979)).

Two additional notes on Henry's testimony. First, Henry's testimony is replete with references to time that he spent on the telephone, conducting meetings, and using CTO documents and resources for campaign purposes. Second, Henry of course was subject to cross-examination on this testimony. In particular, Defense counsel thoroughly cross-examined Henry about his cooperation with the Government and his grant of immunity. And the court specifically instructed the jury:

> You have heard testimony from John Henry who received immunity, that is, a promise from the government that any testimony or other information he provided would not be used against him in a criminal case. You may give his testimony such weight as you feel it deserves, keeping in mind it must be considered with caution and great care.

(Trial Tr. at 2493.)

#### (b) Dittman's Cross–Examination—Alleged Bias from Break-up of Lesbian Relationship

Additionally, Defendant asserts that the court barred inquiries about Dittman's alleged "powerful bias against [her] because [Dittman] blamed Santos for the breakdown of a [lesbian] love affair." (Mem. in Supp. at 7.) At trial, the court thrice precluded defense counsel from cross-examining Dittman about issues relating to her homosexuality.

**10.** Rule 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

Defense counsel initially alluded to Dittman's lesbianism when he argued at sidebar that Dittman's "professional experience is all in working on gay and lesbian issues, and it couldn't possibly have taken her half a day or several days to complete this [a gay and lesbian] questionnaire on behalf of Ms. Santos." (Trial Tr. at 1611.) The court responded, "Now, this roundabout matter of bringing in gay, lesbian experience and expertise, certainly in terms of [Rule] 403 [10] will not be brought to the attention of the jury." (*Id.*) The court recognized that

> "[t]here may be some probative value that in her past she has worked in these activities, and as you would present in that resume. But in terms of 403, it takes the case in an entirely different direction, it takes her testimony off on a tangent. The probative value of going into that particular expertise is far outweighed by the danger of unfair prejudice that could result from it, confusion of the issues, and a waste of time, and might even result in the calling of additional witnesses."

(*Id.* at 1612.) Thus, after careful consideration, the court barred defense counsel from inquiring as to Dittman's experience with gay and lesbian affairs. Defense counsel was still permitted to probe Dittman's dislike of Defendant, but was prohibited from introducing potentially distracting testimony about Dittman's sexual orientation.

In a similar vein, defense counsel asserted at sidebar that Dittman's testimony about her refusal to do campaign work was false. According to defense counsel, the real reason Dittman refused to perform campaign work was that she disagreed with the position on gay rights held by Glen Poshard, the Democratic nominee for Governor of Illinois in 1998. (*Id.* at 1613.) The court responded:

> jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
> Fed.R.Evid. 403.

[T]hat clearly convinces me, well beyond what I said previously, that the probative value of this inquiry is far outweighed by the factors I have cited previous[ly]. To take it a step beyond, to bring in another candidate and another campaign position, clearly illustrates that the court should impose Rule 403. (*Id.*) Thus, the court again considered the probative value of introducing Dittman's position on gay rights (or that her position on gay rights conflicts with Glen Poshard's position), determining that it was substantially outweighed by the dangers of unfair prejudice, confusion, waste of time, and required new testimony about Poshard's views on gay rights. (*Id.*) Despite this ruling, defense counsel asked Dittman: "And one of the things you disagreed with very violently was Glen Poshard, is that correct?" (*Id.* at 1617.) After objection, the court admonished defense counsel for delving into an issue declared off-limits by the court. (*Id.* at 1617–18.) Again, however, the court did not otherwise prevent counsel from questioning Dittman's credibility.

In the instant motion, Defendant argues that the court improperly barred inquiry about Dittman's bitterness over Defendant's alleged responsibility for ending a relationship between Dittman and another woman in the CTO in 1995. Defense counsel vaguely proffered that in 1995, Dittman "secured" the woman to be Defendant's campaign manager. (Trial Tr. at 1619.) Dittman was allegedly engaged in a lesbian relationship with this woman, whom defense counsel referred to as her "lover." (*See id.*) At some point, according to defense counsel, Defendant had a falling out with the woman and Dittman harbored ill will (even at the time of trial) toward Defendant for the events that led to the break-up. (*See id.* at 1619–20.) Significantly, defense counsel's proffer consisted of what "other witnesses" had told him; he did not proffer a statement of Dittman or this woman, the supposed lover. (*See id.*)

At trial, the following transpired outside the presence of the jury:

*Defense Counsel:*

Judge, in terms of a couple of issues with Ms. Dittman: She created the impression that she didn't want to do campaign work, and also the impression that she didn't know Miriam's rule about campaign work on city time.

I want to go into the fact that in 1995 she actually secured the campaign manager for Miriam Santos, who was—and I say this because I don't know what better word to use—her lover; and she was aware of the rule from the 1995 campaign; and that she's unhappy and angry at Ms. Santos because Ms. Santos had a falling out with this woman, whose name is Lisa Cohen; and that is part of her bias in this case.

*The Government:*

That's just not accurate, I believe. First of all, I don't believe there is any such rule in 1995, but that would be irrelevant to a rule in 1997 and 1998. Moreover, again, this—I don't see, other than to sully Ms. Dittman, or attempt to, that there would be any relevance that her partner was once Ms. Santos's campaign manager and no longer is. That was several years prior, and its water under the bridge.

If Mr. Gair wants to ask Ms. Dittman does she harbor any ill will for the prior—for the termination of the prior campaign manager, that's fine. My proffer to the court is I think Ms. Dittman would say no, she doesn't.

*Defense Counsel:*

Well, other witnesses have told me that she does regard it as an extremely serious event, and actually blames Ms. Santos for the breakup of Ms. Dittman and Ms. Cohen's relationship.

*The Court:*

Well, first, all of this comes as somewhat of a surprise to the Court, because it's the first time any of these issues have come to the Court's attention. I think

that you can put into evidence the fact that Ms. Dittman hired the campaign manager in 1995.

*The Government:*

Ms. Dittman did not hire the campaign manager.

*Defense Counsel*

She secured her.

*The Court:*

Secured her. But to make that point, there has been only the briefest limited evidence as to what happened in 1995, and that's been the subject of other rulings.

But to give you something to work with and not to preclude you entirely, you can bring in, if that is the case, that Ms. Dittman had something to do with whom Santos hired as a campaign manager in 1995. But it is still a 403 issue in terms of bringing up these other perceived relationships between the various parties. And it would involve a potential for confusion of the issues, substantial additional time, [and] could result in the calling of other witnesses. It is a highly sensitive area.

And further, I think that all here would understand that in 1999 to have different lifestyle relationships in and of itself does not necessarily reach sullying, but there may be a perception of sullying, and it is a sensitive area.

And that all is taken into account by the Court in approaching this from a 403 basis. There is some relevance, but it is—the probative value of it is substantially outweighed by the danger of unfair prejudice, confusion of issues and other things that I have indicated.

And this ruling is made within the context of all of the evidence in this case, and in light of the previous questions and answers asked of the witness. Now, you would bring this in, I assume, as to her credibility.

*The Government:*

Right, Judge. That's part of it.

*The Court:*

And you are having an opportunity to attack her credibility, but not on these specific points or issues you have indicated.

(*Id.* at 1619–21.)

The court never foreclosed defense counsel's inquiry into Dittman's alleged bias. A review of Dittman's testimony shows that defense counsel attacked her credibility and at times undermined her testimony. In light of the sensitive nature of the potential questions about Dittman's personal life, the court viewed the issue in terms of Rule 403. *See United States v. Pulido*, 69 F.3d 192, 204 (7th Cir.1995) (stating that Rule 403 requires a district court judge "to balance the questionable relevance of the evidence against the hazards of admitting that evidence (*i.e.*, needlessly confusing or misleading the jury and wasting the court's time)"); *see also Quinn v. Neal*, 998 F.2d 526 (7th Cir.1993). As the Seventh Circuit recently stated:

[t]he Sixth Amendment is not implicated every time a limit is placed on a defendant's right to expose bias. When a defendant is allowed to expose an individual's particular motive to lie, 'it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point down to the jury.'

*Manske*, at 777 (*quoting Sasson*, 62 F.3d at 882). Because cross-examination has no natural limits, a district court's judgment when the "point of diminishing returns has been reached[ ] or passed" depends on the particulars of each case and "unreviewable imponderables [such] as the judge's assessment of the jury's comprehension and attention span." *Pulido*, 69 F.3d at 203 (*quoting United States v. Herrera–Medina*, 853 F.2d 564, 566 (7th Cir.1988)).

The court concluded that the introduction of Dittman's sexual orientation and personal relationships could confuse issues, inflame passions, and potentially lead the trial into a needless tangential excursion about a lesbian relationship at the CTO.

Furthermore, such an inquiry may have required additional witnesses, resulting in wasted time. Thus, the court permitted defense counsel to inquire about Dittman's involvement in securing Defendant's campaign manager, and defense counsel could have inquired about other relevant issues. Defense counsel, however, shortly thereafter terminated the cross-examination. In short, defense counsel had ample opportunity to expose a particular bias or motive held by Dittman, but he could not delve into the issues of the lesbian relationship.

The court's limitations of Defendant's cross-examination of Henry and Dittman are not substantial issues for appeal.

### B. Government's Rebuttal Argument

■ Defendant next argues that during rebuttal argument, the Government improperly commented that defense counsel knew about Henry's receipt of cash from brokers. The court excerpts the relevant portion of the Government's argument here:

John Henry testified in this case under a grant of immunity. There is only one single condition to a grant of immunity to protect you from prosecution; that is, that you tell the truth. As long as you tell the truth, you won't be prosecuted. Now, what motive does that give a witness? Think about it. Does that give a witness a motive to lie or to be truthful? John Henry could testify that he shot John F. Kennedy on the stand and he couldn't be prosecuted for that if that were true.

Now, does that give a witness a motive to lie further and conceal, or I think even Mr. Gair cross examined John Henry and said: "The only reason you are willing to admit that you took the cash is because you know you have the grant of immunity."

Now, I would also bring your recollection back to how that testimony about the cash came out. We didn't know about the cash. You heard about that from the stand. John Henry didn't tell us. He also said we never asked. Now

perhaps he should have told us. That's not the point. *The point is Mr. Gair who asked about the cash, knew to ask about the cash.*

(Trial Tr. at 2464–65) (emphasis added.)

Defense counsel immediately objected to the Government's comment that he knew about the cash and requested a mistrial. (*See id.* at 2465.) Defense counsel argued that the comment was improper because it implied that he learned of the cash through Defendant. (*See id.*) Citing *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) and its progeny, the court denied the motion for a mistrial because there was no manifest injustice and a curative instruction would remedy the situation. (*See* Trial Tr. at 2466–69.) The court then instructed the jury as follows:

Members of the jury, disregard the last two sentences of Mr. Krulewitch with respect to what Mr. Gair did or did not know.

You must base your decision upon the evidence that you have seen and heard within these four walls as I have said. You will be instructed more comprehensively at the end of the case. What the attorneys say in closing argument is argument. And to the extent that their arguments are not based or founded on the evidence in the case, disregard them.

(*See id.* at 2469.)

■ An appellate court reviews the denial of a motion for a mistrial "assum[ing] that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial . . . ." *United States v. King,* 150 F.3d 644, 647 (7th Cir.1998) (internal quotation marks and citations omitted). " 'As a general matter, improper comments during closing arguments rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel.' " *United States v. Amerson,* 185 F.3d 676, 685 (7th Cir. 1999) (*quoting United States v. Wilson,* 985 F.2d 348, 353 (7th Cir.1993)). "A new trial is required only if the improper com-

ments prejudiced the defendant's right to a fair trial." *Id. (citing Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *United States v. DePriest,* 6 F.3d 1201, 1209–10 (7th Cir. 1993)).

■■■ As the Seventh Circuit has stated, the review is essentially one of determining whether any alleged error by the Government was harmless:

We must ... decide whether the error of the prosecutor's ways was harmless, or as the cases usually say, did not prejudice the defendants' right to a fair trial. It may seem odd to run the issue of harmlessness in with the issue of the fairness of the trial in this way, but it is not once the precise nature of the alleged misconduct is understood. Misconduct by the prosecutor that is promptly and vigorously corrected by the judge is not reversible error; misconduct that poisons the trial is. The difference is simply the likely impact of the misconduct on the jury. If the impact seems to have been nil ("harmless"), that is just another way of saying that the trial was not poisoned, due process was not denied, reversible error was not committed.

\*　\*　\*　\*　\*　\*

The presumption in our system, artificial as it may sometimes be, is that curative instructions cure, that admonitions to the jury are taken seriously; and if the trial judge believes they were taken seriously as he did here, ordinarily we will have little basis for disbelieving him. We are not quite so naive as to believe that telling jurors not to think about something will cause them to forget it, but we trust juries to behave responsibly and to put aside as considerations bearing on their judgment matters that the judge tells them to put aside.

*United States v. Mazzone,* 782 F.2d 757, 763–64 (7th Cir.1986) (citations omitted). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so in-

fected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (citations and internal quotations omitted); *see also Clark v. Fike,* 538 F.2d 750, 760 (7th Cir.1976) (*quoting United States ex rel. Kirk v. Petrelli,* 331 F.Supp. 792, 795–96 (N.D.Ill.1971) ("The question to be decided is whether the ... statements were so inflammatory and prejudicial to the defendant petitioner as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as prescribed by the Fourteenth Amendment.")).

In deciding whether the district court abused its discretion while addressing alleged prosecutorial misconduct during closing arguments, the appellate court follows a two-step analysis. *See United States v. Cusimano,* 148 F.3d 824, 831 (7th Cir.1998); *United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995). First, the court looks to the comments in isolation to determine their propriety. *See Cusimano,* 148 F.3d at 831; *United States v. Morgan,* 113 F.3d 85, 89 (7th Cir.1997); *Butler,* 71 F.3d at 254; *United States v. Johnson–Dix,* 54 F.3d 1295, 1304 (7th Cir.1995). If the comments were proper, the inquiry ends; however, if the comments were improper, the court considers the comments in light of the entire record to determine if the defendant was consequently deprived of a fair trial. *See Cusimano,* 148 F.3d at 831; *Morgan,* 113 F.3d at 89; *Butler,* 71 F.3d at 254; *Johnson–Dix,* 54 F.3d at 1304; *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.1993); *United States v. Osuorji,* 32 F.3d 1186, 1191 (7th Cir.1994). When assessing the effect of the comments on the trial, the court considers:

1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant.

*Cusimano,* 148 F.3d at 831–32; *United States v. Granados,* 142 F.3d 1016, 1021–22 (7th Cir.1998); *Butler,* 71 F.3d at 254.

The Government's comments, taken alone, are problematic in that they are an oblique allusion that defense counsel learned of the cash through his client. However, when considering the matter in context of the entire trial, the statement was not of such significance that it was incurable. The comment derived from the cash issue developed during defense counsel's cross-examination of Henry, which the Government later pursued on re-direct and with other witnesses, including Defendant. Although Defendant's attorneys could not rebut the comment, the court's curative instruction clearly informed the jury that it should disregard the Government's last comments and decide the case based on the evidence (*see* Trial Tr. at 2469); and of course, the court reiterated this same instruction during its later instructions to the jury. (*See id.* at 2496.)

In sum, the court heard the Government's remarks, met with counsel, and observed the jury. Given the significant amount of evidence, the context in which the evidence developed at trial, and the instructions provided by the court, the court again finds that there was no manifest injustice so as to require a mistrial. The court also concludes that the Government's comments during closing argument do not raise a substantial issue upon which the appellate court is more likely than not to reverse Defendant's conviction on all counts or to order a new trial.

## C. Denial of Motion for a Continuance, and the Constitutional Right to Counsel of Choice

■ Defendant next argues that the court's denial of her motion to continue the trial date violated her Sixth Amendment right to counsel of her choice. Defendant contends that by denying her motion for a continuance, the court effectively prevented her counsel of choice, David Stetler of the law firm Stetler & Duffy, from representing her at trial. Attorney Stetler had argued for a continuance because he anticipated being on trial before Judge Williams in *United States v. Halikias,* 97 CR 694, on the date the court scheduled Defendant's trial. Defendant's argument is meritless and fails to raise a substantial question of law and fact likely to result in reversal or an order for a new trial.

### (1) Background

Before addressing Defendant's argument, the court reviews the relevant portions of the record.

### (a) Arraignment of February 3, 1999

At her arraignment on February 3, 1999, Attorney Stetler and his associate, Corey Rubenstein, filed appearances. Upon Defendant's entry of a plea of not guilty, the Government asked the court to set a trial date. The Government noted Defendant's public denials of wrongdoing and the short duration of the investigation as reasons for its immediate request for a trial date. Attorney Stetler objected, stating that he had a three to four month trial (in *Halikias* ) scheduled to begin on February 15th before Judge Williams. Attorney Stetler also stated that the trial date in *Halikias* had been set for a year. The Government, in response, stated that Attorney Stetler was not the lead counsel in *Halikias* and that other attorneys from Stetler & Duffy were working on the case.

The court overruled Stetler's objection and set a trial date of April 14, 1999 and a filing deadline for pretrial motions of February 24, 1999. The court stated that it did not intend to delay Defendant's case three to four months while Stetler was on trial in *Halikias.* The court also stated that Stetler should have considered his representation of Halikias before he agreed to represent Defendant. Further, the court noted that Stetler still had roughly two months to prepare for trial and that Defendant had a right to a speedy trial.[11]

11. And in an order dated February 5, 1999, the court cited the Speedy Trial Act, 18 U.S.C.

*(b) Defendant's Motion for a Continuance*

On February 10, 1999, Defendant moved for a continuance of the trial date and the date for the filing of pre-trial motions. Defendant sought to postpone the trial until July 1999 and the filing date for pretrial motions until March 10, 1999. As grounds for her motion, Defendant argued that "significant investigation and preparation are required by the complexity of the charges and because ... [Attorney Stetler] will not be relieved of his obligations in a long-scheduled trial in this District before Judge Williams." (Motion for Continuance at 1.) In short, Defendant argued that a continuance should be granted because there was insufficient time to prepare an adequate defense and because she should be allowed counsel of her choice (Attorney Stetler).

Defendant added that if a continuance were granted, "[Attorney Stetler] would be able both to keep his commitment in Judge Williams' court room and to prepare adequately for trial. Even though he will be attending to the trial before Judge Williams, [Attorney Stetler] and his associates would work diligently during the course of [the Halikias trial] to prepare for [Defendant's] trial...." (*Id.* at 2.) Further, Defendant claimed that when Attorney Stetler appeared before Judge Williams after her February 3rd arraignment, Judge Williams indicated that she would

neither continue the trial in *Halikias* nor entertain a motion to permit Stetler to withdraw. Moreover, Defendant stated that "Judge Williams did find, contrary to the prosecutor's suggestion ... at arraignment, that counsel [Stetler's] presence is essential in the [Halikias] trial...." (*Id.* at 2 n. 1.)

At the hearing for Defendant's motion on February 12th, the court enlarged the time for the filing of pretrial motions until March 17th (a week more than Defendant had requested) but refused to continue the trial date. The court rejected Attorney Stetler's arguments that the case was complicated, and in fact more complicated than he initially thought. The court also reiterated that the trial date was consistent with the Speedy Trial Act[12] and that Attorney Stetler should have advised Defendant from the outset that he was set for trial in *Halikias*. The court's other remarks are excerpted here:

> [O]ne of the Court's concerns is that if the schedule of this Court is simply set to accommodate the schedules of busy lawyers, there would be a collapse. The Court's agenda must control the setting of the trial date, not the agenda of busy lawyers. Now, if the Court were to acquiesce in this case and in many other cases, any person who wanted to avoid a speedy trial on the merits could employ a busy lawyer, and that is something the Court should not permit.... [T]his case

§ 3161(c)(1), which provides:

> In any case in which a plea of not guilty is entered, the trial of the defendant charged in an information or indictment of the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whatever date last occurs.

1998 being a non-leap year, the scheduled trial date, April 14th, was 70 days from February 3rd.

**12.** In addition to requiring trial within seventy (70) days of arraignment, the Speedy Trial Act provides that absent the defendant's consent, "trial shall not commence less than thir-

ty days from the date on which the defendant first appears through counsel...." 18 U.S.C. § 3161(c)(2). As noted, the trial date of April 14th was seventy days from February 3rd and therefore in compliance with §§ 3161(c)(1) and 3161(c)(2). Moreover, the court found unpersuasive Defendant's argument (Motion for Continuance at 7 n. 5.) that the factors for granting a continuance under § 3161(h)(8)(B)(iv) applied. That section requires the district court to consider whether the denial of a motion for a continuance "would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant ... the continuity of counsel, or would deny counsel for the defendant ... the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." *See infra.*

**840**

as I see the indictment is not so complex or of such a nature to require a long extension of the trial date in order to prepare.

First, it is a single-defendant case. Many cases in this circuit involve multiple defendants in mail fraud cases and wire fraud cases, and from time to time cases involving campaign laws. So as I view the indictment, I don't see any novel questions of law or fact that suggest it would be unreasonable to proceed on the date set for trial. The government has complied with the Court's order to turn over all of its discoverable material at the 2.04 conference.[13] And in terms of the defense in this case, the plea has been a straight-out not guilty plea, and there is no particular or specific defense which is asserted which might require an extension of time. No statutory defense is raised, and there is no focus on any particular aspect of the case that would seem to indicate the defense would be complicated or would suggest extensive investigation.

Another aspect of the case is that the defendant is charged in the 12-count indictment with doing things that allegedly violate the law at a time when she occupied a position of public trust. The defendant remains in the position, that position of public trust. The indictment mentions or alleges that some of the activities were carried out at the direction of the defendant by persons working in that very office of public trust. And further, that the time and the assets of the public trust office were used to carry out the scheme. So there is a substantial public interest in this case to move it to a conclusion on its merits. And furthermore, when the government makes such serious allegations about a public official who occupies a position of public trust, the government should be held to its burden to prove its case beyond a reasonable doubt in speedy fashion.

Cases like this should not linger. The public has a tremendous issue in knowing whether the government can prove these allegations beyond a reasonable doubt. The defendant is presumed to be innocent and she is not required to prove her innocence. So with all these factors in mind, I am not inclined to grant the extension of the trial date. And I would add this: It is public knowledge that the occupant of the office

13. Local Criminal Rule 2.04(A) provides, in relevant part:

A. *Pretrial Conference.* Within five (5) days after the arraignment the United States Attorney and the defendant's attorney shall confer.

(1) Upon the request of the defendant's attorney, the government shall:

(a) Permit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government;

(b) Permit defendant's attorney to inspect and copy or photograph any relevant results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the government;

(c) Permit defendant's attorney to inspect and copy or photograph any relevant recorded testimony of the defendant before a grand jury;

(d) Permit defendant's attorney to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places which is the property of the defendant and which are within the possession, custody or control of the government;

(e) Permit defendant's attorney to inspect and copy or photograph the Federal Bureau of Investigation Identification Sheet indicating defendant's prior criminal record;

(f) Permit defendant's attorney to inspect, copy or photograph any evidence favorable to the defendant.

(2) [Defense counsel's disclosure obligations]

(3) [Discussing Required Pretrial conference between the United States Attorney and defense counsel]

N.D.ILL.CRIM.R. 2.04.

earns $104,000 a year. And in this case, in pretrial submissions, the Court has been advised that the defendant is a person of substantial means. So in terms of exercising her Sixth Amendment right to counsel of her choice, the defendant has a flexibility that other defendants do not have, as in case of indigency. There are two lawyers who have filed an appearance in this case. And so that while one may be engaged in other matters, at least the other one—and perhaps other people in the office—have the ability to work on pretrial issues.

I have granted the motion to extend time for the filing of pretrial motions. But there is not at this time a sufficient basis and sufficient cause, considering the factors that I have just mentioned, to change the date of trial. Trials can be continued for good cause shown, but as of today not enough has been shown.... There may be unforeseen circumstances of course that come into play which might cause the Court to change the date of the trial. But as of today, the 12th of February, I am not going to continue a trial that is set for the 14th of April....

(Tr. of February 12, 1999 at 4–8.)

*(c) Appearance of Attorney Chris Gair*

On February 23, 1999, Attorney Chris Gair, on behalf of Defendant, moved for leave to file an additional appearance pursuant to Local General Rule 3.15. On February 26, 1999, the court granted the motion and Attorney Gair appeared in court on behalf of Defendant. Attorney Gair stated that he did not intend to move for a continuance and also remarked: "I must tell the Court that I don't think there would be anyone in the City who would be able to prepare better in the time frame allotted, and I have been doing that assiduously." (Tr. of February 26, 1999 at 2.)

Nonetheless, on April 13, 1999, the day before the trial was scheduled to begin, Attorney Gair made a final attempt to continue the trial date, arguing that Defendant has a right to counsel of her choice—

Attorney Stetler. The court again denied Defendant's motion, but noted that the trial may be briefly delayed if another ongoing trial before the court, *United States v. Liscak*, 97 CR 744, had not yet reached the jury. On April 14, 1999, voir dire and jury selection in Defendant's case began.

*(2) Applicable Law*

It is well established that a district court has broad discretion to decide whether to grant a motion to continue the trial date. *See Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *United States v. Tingle*, 183 F.3d 719, 722 (7th Cir.1999); *United States v. Depoister*, 116 F.3d 292, 294 (7th Cir.1997); *United States v. Windsor*, 981 F.2d 943, 948 (7th Cir.1992); *United States v. Rasmussen*, 881 F.2d 395, 400 (7th Cir.1989); *United States v. Manos*, 848 F.2d 1427, 1434 (7th Cir.1988); *United States v. Rodgers*, 755 F.2d 533, 539 (7th Cir.1985). Therefore, a district court's disposition of a motion to continue will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion and a showing of actual prejudice. *See Tingle*, 183 F.3d 719, 722; *United States v. Miller*, 159 F.3d 1106, 1113 (7th Cir.1998); *United States v. Schwensow*, 151 F.3d 650, 656 (7th Cir.1998); *Depoister*, 116 F.3d at 294; *United States v. Koen*, 982 F.2d 1101, 1114 (7th Cir.1992); *United States v. Blandina*, 895 F.2d 293, 297 (7th Cir.1989); *Rodgers*, 755 F.2d at 539. "The district court 'abuses' its discretion only when ... the trial judge chose an option that was not within the range of permissible options from which [a reviewing court] would expect the trial judge to choose under the given circumstances." *Depoister*, 116 F.3d at 294 (citations omitted.). Thus, "[t]his issue must be decided on a case by case basis in the light of the circumstances presented, particularly the reasons for continuance presented to the trial court at the time the request is denied." *Manos*, 848 F.2d at 1434; *see also United States v. Davis*, 604 F.2d 474, 480 (7th Cir.1979) ("Reported

decisions offer little guidance [in reviewing rulings on continuances]; each decision necessarily turns on the particular facts and circumstances of the case."). " 'It is critically important that a trial court be able to maintain control over its calendars and that a trial date once set must be adhered to unless there are compelling reasons for granting a continuance.' " *United States v. Bush*, 820 F.2d 858, 860 (7th Cir.1987) (*quoting Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1230 (7th Cir.1983)); *see also Morris*, 461 U.S. at 11, 103 S.Ct. 1610 (trial judge's burden of coordinating a trial date "counsels against continuances except for compelling reasons."); *cf.* § 3161(h)(8)(B)(iv).

█ In reviewing the denial of a motion for a continuance, the Seventh Circuit has stated that relevant factors include: (1) the quantum of time available for preparation; (2) the likelihood of prejudice from denial; (3) the accused's role in shortening the effective preparation time; (4) the degree of complexity of the case; (5) the availability of discovery from the prosecution; (6) the adequacy of the defense actually provided at trial; (7) the skill and experience of the attorney; (8) any pre-appointment or pre-retention experience of the attorney with the accused or the alleged crime; and (9) any representation of the defendant by other attorneys that accrues to the defendant's benefit. *Bush*, 820 F.2d at 860 (*citing United States v. Uptain*, 531 F.2d 1281, 1286–87 (5th Cir.1976)).

█ Most relevant here, where defense counsel moves for a continuance based on a scheduling conflict, the district court must also consider the defendant's Sixth Amendment rights, which provide a defendant "a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77

L.Ed. 158 (1932) [14]; *cf. Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (Sixth Amendment grants the accused personally the right to make his defense). Though there is a presumption in favor of the defendant's counsel of choice, *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), that Sixth Amendment right " 'is not absolute, but qualified, and must be balanced against the requirements of the fair and proper administration of justice.' " *Rasmussen*, 881 F.2d at 401 (*quoting United States v. Micke*, 859 F.2d 473, 480 (7th Cir.1988)); *see also Wheat*, 486 U.S. at 159, 108 S.Ct. 1692 (focus of Sixth Amendment inquiry is the adversarial process, not on the defendant's relationship with his lawyer) (*citing United States v. Cronic*, 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). As Justice Brennan explained in his concurring opinion in *Morris:*

> The defendant's interest in preserving his relationship with a particular attorney is not afforded absolute protection. If the attorney is likely to be unavailable for an extended period, or if other factors exist that tip the balance in favor of proceeding in spite of a particular attorney's absence, the defendant's motion for a continuance clearly may be denied.

*Morris*, 461 U.S. at 25, 103 S.Ct. 1610 (Brennan, J. concurring in the result (joined by Marshall, J)). Thus, " 'where the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial, the court may require the defendant to secure other counsel.' " *Kleba v. McGinnis*, 796 F.2d 947, 952 (7th Cir.1986) (*quoting United States v. Cicale*, 691 F.2d 95, 106 (2nd Cir.1982)). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for

---

14. The text of the Sixth Amendment provides: In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. CONST. amend. VI.

delay' violates the right to the assistance of counsel." *Morris*, 461 U.S. at 11, 103 S.Ct. 1610. Accordingly, like the oft-intertwined issue of continuances, "[c]hoice of counsel ·rulings by the district court are reviewed on appeal for abuse of discretion." *United States v. Brown*, 79 F.3d 1499, 1505 (7th Cir.1996).

### (3) Discussion

From the outset, the court finds it appropriate to comment briefly on Attorney Stetler's representations to the court. Defendant retained Attorney Stetler on January 18, 1999, nine days before the Government filed its 12–count indictment on January 27, 1999.[15] Notably, however, the court's review of the docket for *Halikias* indicates that Attorney Stetler did not file his appearance in that case until January 21, 1999, three days after he was retained by Defendant; meanwhile, the appearance of his partner, Attorney Joseph Duffy, had been in the record for *Halikias* since November 1997. That raises questions with respect to Attorney Stetler's scheduling decisions, for· it appears that Attorney Stetler could have represented Defendant instead of Halikias. At the very least, Attorney Stetler's decision to file appearances on behalf of two clients within two weeks presumed that the trial dates for his clients would not conflict.[16]

Moreover, the court notes that Attorney Stetler suggested a July 1999 trial date in this case even while acknowledging that he was scheduled to be on trial in the Southern District of Illinois at that same time. (*See* Motion for Continuance at 10 n. 6.) Attorney Stetler, however, presumed that Chief Judge Gilbert would postpone the July 1999 trial date at a status hearing scheduled for March 1999; of course, there was no guarantee that would occur, as Attorney Stetler conceded: "In the unlikely event that Judge Gilbert does not move the trial date [at the March 1999 status], then Santos will retain new counsel." (*Id.*) Thus, it is clear that even if the court had granted Defendant's motion for a continuance, Attorney Stetler may have ultimately been forced to withdraw, thereby causing further delay (perhaps beyond July 1999) and a renewed motion to continue. *Cf. Morris*, 461 U.S. at 25, 103 S.Ct. 1610 (Brennan, J., concurring) ("The trial court's only duty is to inquire into the expected length of the attorney's unavailability and to determine whether the existing attorney-client relationship can be preserved consistent with society's interests."). Defendant apparently did not anticipate this potential scenario when

---

**15.** Up until January 15, 1999, Defendant was represented by the law firm Jenner & Block. Defendant retained Jenner & Block to represent her personally in September 1998, when the Government's investigation was disclosed. (*See* Motion for Continuance at 4.) Included in the record are two checks written to Jenner & Block for representation of Defendant; one check, dated September 18, 1998, was issued by the "Friends of Miriam Santos," while the other, dated November 6, 1998, was issued by "Miriam Santos for Attorney General." (See Attorney Rubenstein's Letter to Probation dated July 23, 1999.) The signatory on ˙the "Friends of Miriam Santos" check is Defendant, whereas the signatory on the other check is not shown on the copy submitted to the court.

Notably, Jenner & Block was the same law firm that Defendant, in her capacity as Treasurer, hired to perform city business; Jenner & Block's city business included the drafting of a letter to Citibank dated May 18, 1998 which the Government introduced as evidence at trial. (*See* Gov't Ex.—"Citibank 3.") Ultimately, Jenner & Block's earlier representation of the CTO posed a conflict of interest that prompted the firm to withdraw its representation of Defendant on January 15, 1999.

**16.** *See generally American Bar Association Standards for Criminal Justice Prosecution Function and Defense Function*, Standard 4–1.3(e) (1993) ("Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation, endangers the client's interest in the speedy disposition of charges, or may lead to the breach of professional obligations...."); *American Bar Association Model Rules of Professional Conduct* Rule 1.7(b) (addressing a lawyer's duty to his client when his representation may be limited by other considerations, including his representation of another client).

she stated that if the court granted her motion for a continuance, "defense counsel would not seek any additional continuances." (Motion for Continuance at 2.)

In any event, the result for purposes of the instant motion is that Defendant fails to raise a substantial question of law and fact likely to result in reversal or an order for a new trial. In short, Defendant fails to show any indication that the court abused its discretion by denying her motion to continue the trial or actual prejudice. As stated in the record, there were numerous reasons for denying Defendant's motion for a continuance that substantially outweighed her qualified right to counsel of choice under the Sixth Amendment. (Tr. of February 12, 1999 at 4–8.) The court briefly revisits some of those reasons here.

First, the court refused to permit Attorney Stetler's trial schedule to control the court's schedule. As noted, to allow an attorney to control the court's schedule would likely result in some defendants purposefully retaining busy lawyers to hamper the administration of justice. Those defendants would actively seek the representation of a particular attorney for his or her near term unavailability, rather than for the quality of expected performance. *See McGinnis*, 796 F.2d at 952 ("[T]he Sixth Amendment does not give an accused the power to manipulate his choice of counsel to delay the orderly progress of his case."). And while a defendant has a qualified right to counsel of choice, her attorney should also not be allowed to impede the administration of justice by accepting additional clients despite an already busy trial schedule.[17]

Second, the court noted that this was not a complicated case. This case involved one defendant and did not trigger any novel issues of law or fact. Further, Defendant did not raise any statutory defense, the Government had timely turned over all discoverable material pursuant to Local Criminal Rule 2.04, and the charges did not require an extensive investigation to prepare a defense.

Third, this was not a case where defense counsel had merely a couple of days or a week to prepare for trial; nor was this a case where Defendant had only one attorney at trial. It must be emphasized that Defendant and her initial set of attorneys of record (Attorneys Stetler and Rubenstein) had over two months from the date of her arraignment to prepare a defense. Attorney Stetler, though he did not represent Defendant at trial, never moved to withdraw his appearance, and Attorney Rubenstein did ultimately represent Defendant at trial with Attorney Gair. Attorney Gair had seven weeks to prepare a defense (with Attorney Rubenstein's assistance) from the date of his appearance.[18]

Fourth, this case involved serious allegations of misconduct against a public official who remained in office while the charges were pending. The public's substantial interest in this case cannot be overstated; nor can the presumption of Defendant's innocence. The public, *as well as Defendant*, were entitled to a conclusion on the merits.

Fifth, the court noted that Defendant's financial resources allowed her flexibility with respect to her choice of counsel. Indeed, Defendant retained additional pri-

---

**17.** *See generally American Bar Association Standards for Criminal Justice Prosecution Function and Defense Function*, Standard 4–1.3(e) (1993) ("Defense counsel should not accept employment for the purpose of delaying trial.")

**18.** Four additional notes: (1) Defendant and her original personal attorneys (Jenner & Block) were aware of the investigation since its disclosure in September 1998 (Motion for Continuance at 4); (2) Attorney Stetler's rep-

resentation, at least to the extent of his in-court appearances, ceased only one month after Defendant had retained him; (3) Defendant is a licensed attorney with professional experience in the criminal justice system; and (4) this was not a case where the court forced certain representation upon the defendant. *Compare Faretta*, 422 U.S. at 808–36, 95 S.Ct. 2525 (court violated defendant's Sixth Amendment rights by forcing him to be represented by counsel).

vate counsel (Attorney Gair) upon the court's denial of her motion for a continuance. Attorney Gair, a former federal prosecutor, has extensive trial experience in the federal courts.[19] And at his initial appearance, Attorney Gair stated that he did not intend to move for a continuance and commented that he was "assiduously" preparing for trial, which, again, was still some seven weeks away. At trial, there was no indication that Attorney Gair was unprepared, as he, along with Attorney Rubenstein, represented Defendant zealously and professionally. *See Rodgers,* 755 F.2d at 541 (no prejudice from denial of continuance where defense counsel adequately represented the defendant at trial). Defendant went to trial each day with two competent attorneys, with an additional third on record. Defendant therefore cannot argue that she suffered prejudice as a result of the denial of her continuance.

In sum, Defendant's claim that the court's denial of her motion to continue effectively denied her of her attorney of choice is without merit and fails to raise a substantial issue for appeal. The right to chosen counsel is not absolute, and the court, after considering Defendant's arguments, exercised its discretion to find that other considerations outweighed Defendant's qualified right. Simply put, Defendant failed to show "compelling reasons," *Bush,* 820 F.2d at 860, to continue the trial date; accommodating the schedule of Attorney Stetler would have caused inconvenience and unnecessarily impeded the interests of justice. And in any event, Defendant was able to retain (additional) competent counsel within plenty of time to prepare a defense. As the Supreme Court has explained:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably

be represented by the lawyer whom he prefers.

*Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *see also United States v. Messino,* 181 F.3d 826, 830–31 (7th Cir.1999) ("The Sixth Amendment guarantees adequate counsel, not the best possible counsel.").

### D. Exclusion of Defenses

Defendant next argues (in a five-sentence paragraph) that the court improperly precluded her from presenting three types of evidence: (1) evidence that contradicted the Government's theory that she had ordered brokers cut off because they did not contribute to the Democratic Party of Illinois; (2) evidence to refute the Government's position that CTO employees always accepted the highest bid from brokers; and (3) evidence of her medical condition. (*See* Mem. in Supp. at 9.) Defendant, however, fails to support these assertions with any case law or citations to the trial transcript. (*See id.*) The district court is not obliged to articulate movants' arguments for them. *Cf. Thompson,* 33 F.3d at 853; *Erff,* 781 F.2d at 618. As noted, Defendant carries "the burden of showing the merit of the appeal[.]" *Shoffner,* 791 F.2d at 589. Defendant's bare assertions fail to address, much less satisfy, this standard. In any event, the court finds that its rulings excluding certain evidence do not raise a substantial issue for appeal.

#### (1) Evidence of Defendant's Lawful Conduct—Brokers Not Cut–Off

■ The court presumes, as does the Government, that Defendant's first contention refers to evidence regarding three brokerage firms that CTO employees solicited for contributions, but did not cut off. The court properly excluded this evidence from the trial because "[a] defendant may not seek to establish his [or her] innocence

---

19. This court presided over a civil case in which Attorney Gair was trial counsel: *Walsh v. McCain Foods Limited,* 86 C 7753, 1995 WL 443938 (N.D.Ill. 1995). *See also Walsh v. McCain Foods Ltd.,* 1995 WL 443938 (N.D.Ill. July 25, 1995).

... through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa,* 897 F.2d 63, 70 (2d Cir. 1990) (*citing United States v. O'Connor,* 580 F.2d 38, 43 (2d Cir.1978); *United States v. Shapiro,* 159 F.2d 890, 891 (2d Cir.1947), *aff'd,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); 1A Wigmore on Evidence § 56.1 (Tillers rev.1983)); *see also United States v. Winograd,* 656 F.2d 279, 284 (7th Cir.1981) ("The district judge correctly refused to admit the evidence on this basis because evidence that [defendant] engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades.") (*citing United States v. Dobbs,* 506 F.2d 445, 447 (5th Cir.1975); *Herzog v. United States,* 226 F.2d 561, 565 (9th Cir.1955)). Accordingly, the court granted the Government's "Motion *in limine* to Exclude Evidence and Argument of Lawfulness and Non-Corrupt Conduct." Moreover, the court found unpersuasive Defendant's assertion that "[t]he evidence relating to other brokers who did not contribute and were not cut off is therefore plainly relevant ... not because it shows that Santos acted lawfully on certain other occasions and thus acted lawfully on this occasion, but *because it contradicts the government's theory of what happened.*" (Resp. to Mot. to Exclude at 4) (emphasis added). In short, Defendant's unsupported assertion that the court's prior ruling was incorrect fails to support her burden of showing a substantial issue for appeal.

### (2) Evidence to Refute Acceptance of Highest Bids from Brokers

Next, Defendant argues that the court improperly excluded evidence to refute the Government's position that CTO employees always accepted the highest bid from brokers. (*See* Mem. in Supp. at 9.) Again, the court finds no error with its prior ruling. During the trial, Errera stated that she did not always accept the highest bid from a broker. (*See* Trial Tr. at 957.) Defense counsel then attempted to cross-examine Errera about trades in which the highest bid was not accepted. (*See id.*) Addressing that testimony, the court stated that "what [Errera] did on prior occasions in terms of taking the higher bid or the lower bid or taking other factors into account is not relevant to what occurred on these 30 specific identifiable occasions." (*Id.* at 960–61.) Furthermore, the court barred the testimony as prejudicial under Rule 403. (*See id.* at 961–63.) Defendant's bare assertion that the court improperly excluded this testimony fails to sustain her burden of showing a substantial issue for appeal.

### (3) Medical Evidence of Defendant's Thyroid Condition

The court also properly excluded the testimony of Defendant's physician. On April 12, 1999, two days before trial, the Government received notice that Defendant intended to present evidence (that she would also describe during her opening statement) of a medical condition related to her thyroid. (*See* Govt. Emergency Mot. to Exclude at 1.) Specifically, in Defendant's notice to the Government, defense counsel stated:

> Miriam does indeed have a thyroid condition, as documented in the enclosed medical records, and the result is that unless her medication is just right, she tends to be overly emotional and can be perceived as somewhat rude. I expect her physician to testify to these matters.

(*See id.*) The Government then filed an emergency motion to exclude the testimony, arguing that it was untimely disclosure of an expert witness, *see* Fed.R.Crim.P. 12.2(b), and that it was an insufficient proffer of expert testimony under Federal Rule of Criminal Procedure 16(b)(1)(c).[20]

After hearing oral arguments on April 13th, the court granted the Government's motion. The court first rejected Defendant's assertion that she was not presenting an expert witness. (*See* April

---

**20.** Rule 16(b)(1)(C) requires a "summary describ[ing] the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications."

13, 1999 Tr. at 3–4, 6–8.) The court then concluded that Defendant's notice was untimely and that she failed to provide a sufficient basis to substantiate the admission of the testimony. (*See id.* at 8.)

The court's ruling was consistent with Federal Rule of Criminal Procedure 12.2(b), which states:

> If a defendant intends to introduce expert testimony relating to a mental disease or defect of any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

Fed.R.Crim.P. 12.2(b). And as the Seventh Circuit has explained:

> One of the reasons that Congress enacted Rule 12.2(b) was to enable the government to prepare for cross-examination of the defendant's expert witnesses and to present any rebuttal witnesses to counter the defense expert's testimony. *See* Conference Committee Notes, H.R.94–414, 1983 amendment to Rule 12.2(b) (noting that lack of notice "would have meant that the government would not have been equipped to cross-examine the expert, that any expert called by the government would not have had an opportunity to hear the defense expert testify and that the government would not have had an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony on defendant's claim concerning his lack of mental capacity.")

*United States v. Buchbinder,* 796 F.2d 910, 915 (7th Cir.1986). In short, Defendant's late notice of the expert testimony would have required the Government to evaluate the testimony with its own expert and postponement of the trial. *See id.* (giving notice of expert testimony two weeks prior to trial and filing a psychiatrist's report one week before trial violated Rule 12.2(b)); *United States v. Weaver,* 882 F.2d 1128, 1136 (7th Cir.1989) (finding that when notice of expert testimony filed one week prior to trial would delay the trial, the notice was untimely filed under Rule 12.2.(b)).

Moreover, the court stated at the April 13th hearing: "[I]t may well be that you could call nonexpert witnesses who could testify about the way Miss Santos speaks and so forth, and tone." (April 13, 1999 Proceedings at 7.); *see Weaver,* 882 F.2d at 1136 ("no prejudice from counsel's failure to secure expert testimony, because of late notice, where jury was made aware of the issue through the testimony of other witnesses") (*citing United States v. Paradis,* 802 F.2d 553, 564 (1st Cir.1986)); *Buchbinder,* 796 F.2d at 915 (district court did not abuse discretion in refusing to allow expert witnesses to testify when defendant failed to timely notify pursuant to Rule 12.2(b)). In fact, Defendant herself testified about her condition and how it kept her from working for six weeks:

Q. [D]id you have an operation at that time?

A. Yes, I had pretty major surgery.

Q. What was that?

A. I had developed a huge tumor in my thyroid gland, and it was pressing up against my vocal chords, and so I had to have not only the tumor removed and the vocal chords cleaned up, but I also had to have the—I lost half of my thyroid.

\*\*\*

Q. And did there come a time when you returned to work part-time?

A. Yes. At about six to—about six weeks after my surgery I returned part-time.

(*See* Trial Tr. at 1854–55.) Thus, Defendant testified as to how her operation affected her, and she had the opportunity to present other witnesses who had personal

knowledge to do the same. Given the opportunity to present nonexpert witnesses, Defendant's inability to submit the testimony of her physician was not improper.

For these reasons, Defendant fails to show a substantial issue as to whether the court improperly excluded the testimony of her physician.

### E. Admission of Citibank Evidence and Reference to Citibank in Closing Argument

 Defendant's next argument is that she was deprived of a fair trial because the court erroneously admitted certain evidence relating to Citibank and because the Government, in its closing argument, improperly argued that "the Citibank evidence alone required conviction on the fraud counts." (Mem. in Supp. at 9–10.) As the Government notes, Defendant's four-sentence argument includes no citations to the record or to any authority. Yet, the Government likewise fails to cite to the record or to authority. (Resp. at 28–30.) In any event, Defendant fails to show a substantial issue for appeal.

#### (1) Testimony of Citibank Executive Samuel Borowski

Defendant first argues that the court erroneously allowed Samuel Borowski ("Borowski"), a Citibank executive, to speculate as to why Defendant directed an attorney to send a letter dated May 18, 1998 to Citibank (referred to as "Citibank 3") "regarding [software] service performance that Citi [sic] provides to the treasurer's office."[21] (Trial Tr. at 1310.) At trial, Borowski testified that receipt of an attorney's letter complaining about service problems was unusual. (See id. at 1312.) Borowski also testified that when he received Citibank 3, he was dismayed and shocked (see id. at 1313) because there was no legitimate business reason it. (See id. at 1314.) Moreover, Borowski believed

that Citibank 3 related to conversations he had had with Defendant about campaign contributions. (See id. at 1315.)

Borowski's testimony demonstrated Citibank's state of mind upon receiving Citibank 3. Further, the testimony provided relevant and probative information as to the charges in the indictment, specifically, whether Defendant conducted business in the best interests of the City. Defendant's argument therefore fails to raise a substantial issue for appeal.

#### (2) Admissibility of Citibank's Suspicious Activity Report ("Citibank 4")

Defendant next asserts that the court improperly admitted a Suspicious Activity Report ("Citibank 4") that Citibank prepared on March 26, 1998 after Defendant telephoned Borowski to seek campaign contributions on March 10th and 11th of 1998. (See Mem. in Supp. at 9–10.)

Although defense counsel twice asserted at trial that Citibank 4 was not a business record (see Trial Tr. at 1297, 1304), they failed to support their assertions. Nor does Defendant support this position in the instant motion. (See Mem. in Supp. at 9–10.) Thus, Defendant's argument that Citibank 4 was improperly admitted is unsupported.

In any event, the Government offered the Report not for its truth, but to demonstrate that Citibank prepared the document and sent it to the United States Attorney's Office in Chicago. (See Trial Tr. 1297–99.) To this end, the court gave the following limiting instruction:

> Members of the jury, the government is not offering on page 3 the summary for the truth of its contents, but merely that, as required by federal statute, this document was prepared, this "suspicious Activity Report" was prepared, and that this report was a business record of Citibank.

---

21. As already noted, Defendant hired the law firm of Jenner & Block to provide certain legal services to the CTO, including the drafting of Citibank 3. One other service that Citi-

bank was retained to perform for the City was custodial services for approximately $1.4 billion of assets.

\*\*\*

And so when you look at page 3 in the summary, beginning with the word—the name "Miriam Santos," that you are not to take for the truth of what it says there, but that this was recorded and became a business record of the Citibank, and that it was prepared in keeping with its federal requirement to make such a report.

And for that limited purpose, you may consider the document.

(*Id.* at 1300–01.) Defendant offers nothing to refute the court's statement at trial that her "hearsay [argument] may be a red herring because [the court had] limited the basis for [the Report's] admissibility." (*Id.* at 1304.)

Nonetheless, beyond the court's limiting instruction, Citibank 4 was admissible as a business record under Rule 803(6). (*See* Trial Tr. at 1300.) Indeed, Borowski testified that federal law required Citibank to maintain this type of document within its business and that Citibank, as a practice, maintained such documents. (*See id.* at 1296–97.) Accordingly, the court found that the Government laid the proper foundation for Citibank 4 and that it was admissible as a business record. *See* Fed. R.Evid. 803(6).

The court also concluded that Citibank 4 was inherently reliable and trustworthy because Citibank prepared it subject to federal law. (*See id.* at 1304–05; *see also* Citibank 4 at 3.) The court considered and dismissed Defendant's assertion that Citibank 4 included prejudicial hearsay. (*See id.* at 1305.) Moreover, Citibank 4 is clearly relevant to the background and chronology of events. Additionally, the court did not allow Borowski to read Citibank 4. (*See id.* at 1306.) In sum, Defendant fails to show a substantial issue regarding Citibank 4's admission. *See United States v. Krankel,* 164 F.3d 1046, 1054 (1998).

### (3) The Government's Allegedly Improper Summary of the Charges During Its Closing

Defendant's entire argument attacking the Government's closing argument consists of the following: "[T]he government wrongly argued in closing that the Citibank evidence alone required conviction on the fraud counts." (*See* Mem. in Supp. at 10.) In its closing argument, the Government argued that there were three separate ways that the jury could find Defendant guilty of mail or wire fraud:

The first is the undue pressure on the firms to contribute. This is much of the same evidence as the attempted extortion. So one is the attempts to get money.

Two, Citibank alone, if you believe that she used a scheme or intended to defraud with the Citibank evidence, that's paragraph 12 of the indictment, you can find her guilty based on that alone.

And the third way you can find her guilty, separate and apart from the other two on the mail and wire fraud, is the honest services count. This is all the campaign work on City time and City property.

We have proved all three of those to you, ladies and gentlemen.

(Trial Tr. at 2396.) Defense counsel then objected, stating: "I object. I believe that counsel has misstated what the charges are." (*Id.*) The court responded: "All right. The objection is overruled. Members of the jury, you will receive a copy of the indictment when you go in to deliberate, along with a full set of instructions that will apply." (*Id.* at 2396–97.) Defense counsel did not object further, apparently accepting the court's cure of the perceived defect. (*See id.* at 2397.)

The court rejects Defendant's claim that the Government's statements directed the jury to find Defendant guilty of all of the fraud counts based solely on the Citibank evidence. The court cured the problem that defense counsel perceived with its in-

struction to the jury. (*See* Trial Tr. at 2396–97.)

And even if the remark was improper, it did not so prejudice the proceedings as to deprive Defendant of a fair trial. The Seventh Circuit recently explained:

> To decide whether a prosecutor's comments have deprived a defendant of a fair trial, 'we first look at the disputed remarks in isolation to determine if they are proper.' *United States v. Cotnam*, 88 F.3d 487, 498 (7th Cir.1996). *Accord United States v. Kelly*, 991 F.2d 1308, 1315 (7th Cir.1993). If the remarks are determined to be improper, we 'consider the remarks in light of the entire record to determine if the defendant was deprived of a fair trial.' *Cotnam*, 88 F.3d at 498. *Accord Kelly*, 991 F.2d at 1315.

*United States v. Brisk*, 171 F.3d 514, 524 (7th Cir. Mar.23, 1999). To this end, a court examines five factors: "(1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutor's statements were invited by impermissible conduct by defense counsel, (3) whether the trial court instructed the jury to disregard the statements, (4) whether the defense was able to counter the improper statements through rebuttal, and (5) the weight of the evidence against the defendant." *Brisk*, 171 F.3d at 524 (*citing Cotnam*, 88 F.3d at 498; *Kelly*, 991 F.2d at 1315); *see also United States v. Hall*, 165 F.3d 1095, 1116 (7th Cir.1999).

Although the Government's statements were not invited by impermissible conduct by Defendant's attorneys (*see* Trial Tr. at 2396), the other four factors weigh against the grant of a new trial. First, the Government's statements were not outrageous or inflammatory. And again, the court cured any potential impropriety by stating: "Members of the jury, you will receive a copy of the indictment when you go in to deliberate, along with a full set of instructions that will apply." [22] (Trial Tr. at 2397.) Also, defense counsel was able to

counter the statements in his closing argument. Finally, given the weight of the evidence against Defendant, the Government's statements did not prejudice the outcome of the trial.

In sum, Defendant's attack of certain statements made during the Government's closing argument fails to raise a substantial issue for appeal.

## VI. CONCLUSION

Having reviewed the record, the court finds that Defendant fails to present any substantial issue that would prompt an appellate court to reverse her convictions or order a new trial. *See* § 3143(b)(1)(B). The record reflects that Defendant was represented by competent counsel and that she received a fair trial that concluded with a unanimous verdict by her peers, who found Defendant guilty beyond a reasonable doubt of attempted extortion and mail fraud. Because Defendant fails to sustain her burden under § 3143(b)(1)(B), the court denies her Motion for Release Pending Appeal.

IT IS SO ORDERED.

---

22. The jury later received copies of the indictment and jury instructions. That Defendant was found "guilty" on six counts and "not guilty" on six counts indicates that the jurors reviewed each count of the indictment.